**FLOYD, Maria E., individually and as personal representative of the Estate of Floyd, James H., Deceased, Appellant,**

v.

**LYKES BROS. STEAMSHIP CO., INC.**

No. 87–1596.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) March 9, 1988.

Decided April 21, 1988.

Walter Z. Steinman, Philadelphia, Pa., for appellant.

John T. Biezup, Palmer, Biezup & Henderson, Philadelphia, Pa., for appellee.

Before WEIS[*], GREENBERG, and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question for decision is whether the captain of a merchant ship violated applicable maritime law when he buried at sea a seaman who died of a heart attack on the return trip of the vessel eight days from its next port-of-call. After seaman James Floyd died, the captain conducted a burial-at-sea ritual. Maria Floyd, the seaman's daughter, for herself, as executrix of her father's estate, and for the next-of-kin, sued the vessel's owner for improperly disposing of her father's body. The district court granted summary judgment in favor of Lykes Bros. Steamship Company. Maria Floyd has appealed. We will affirm.

Jurisdiction was proper in the district court based on 46 U.S.C. §§ 688, 761. Jurisdiction on appeal is proper based on 28

---

* The Honorable Joseph F. Weis Jr. was an active judge at the time this appeal was decided. He has now assumed senior status.

U.S.C. § 1291. Appeal was timely filed under Rule 4(a)(1), F.R.App.P.

## I.

James H. Floyd, an ordinary seaman, died on board the *S.S. Shirley Lykes* between 2000 and 2400 hours on August 19, 1983. The vessel was at sea passing through the Straits of Gibraltar, en route from Europe to Canada and the United States, eight days from her next port-of-call. The next morning, the crew prepared Floyd's body for burial and encased in it canvas, placing weights in the bottom of the canvas bag. At approximately 1320 hours on August 20, 1983, the crew carried Floyd's body to the fantail of the *Shirley Lykes* and draped an American flag over the bag containing the remains. A number of the crew and passengers assembled, and Captain Powell recited a short eulogy and prayer. Floyd's body was then consigned to the deep.

At 0810 and 1500 hours on August 20, crew members sent two brief messages to the Lykes Bros. Steamship Company, the owner of the *Shirley Lykes*, in New Orleans. The first reported that Floyd had died of a heart attack and would be buried at sea. App. at 234. The second indicated that Floyd was buried at sea at 1336 hours on that date. *Id.* at 235. Neither Captain Powell nor the shipping company notified Floyd's next-of-kin prior to burying the decedent at sea.

Maria Floyd subsequently filed a complaint in the district court against Lykes. Count one of the complaint alleged a cause of action for wrongful death. The district court granted Lykes' motion for summary judgment on Count one, ruling that there was no evidence that Floyd's death was caused by any acts or omissions of the company. *Floyd v. Lykes Bros. S.S. Co.*, 655 F.Supp. 380, 382–83 (E.D.Pa.1987).

Count two of the complaint alleged that Lykes was liable for improperly disposing of Floyd's body by burying it at sea. It sought damages for Maria Floyd, her mother, and her seven brothers and sisters. On March 11, 1987, the district court granted Lykes' motion to dismiss this count with respect to the decedent's mother, brothers, and sisters, stating that the only person entitled to bring a claim for the allegedly improper disposition of the remains of a decedent is the decedent's next-of-kin. *Id.* at 384–85. The district court subsequently granted Lykes motion for summary judgment, and entered an order dismissing plaintiff's complaint with prejudice. App. at 249. Maria Floyd appeals only from the district court's grant of summary judgment on Count two of the complaint.

## II.

The standard of review is familiar. Summary judgment may be granted only if no genuine issue of material fact exists. Rule 56(c), F.R.Civ.P.; *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). An issue is "genuine" only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2509, 91 L.Ed. 2d 202 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.*, 106 S.Ct. at 2510. On review, this court applies the same test that the district court should have adopted. *Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 449 (3d Cir.1987).

## III.

On appeal, Floyd contends that state tort law has established that the spouse or next-of-kin is entitled to possession of a body for the purpose of arranging for final disposition of the remains, *see, e.g., Blanchard v. Brawley*, 75 So.2d 891, 893 (La.Ct.App.1954), and that violation of the right of possession and burial is an actionable tort. *See, e.g., Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118, 120 (1970). She argues that this state law tort precept should be incorporated into general maritime law. She says that currently recognized maritime authority deems burial at

sea anachronistic and improper when the next-of-kin are not notified in advance.

Lykes responds that this case is not governed by state tort concepts, but by federal maritime law. Relying on *Brambir v. Cunard White Star, Ltd.*, 37 F.Supp. 906 (S.D.N.Y.1940), *aff'd mem.*, 119 F.2d 419 (2d Cir.1941), Lykes argues that maritime law does not provide a cause of action for burial at sea.

### IV.

■ We are satisfied that maritime law controls this case, and that the following maritime law precepts steer us to an appropriate result. Although common law originated in the customs on land, 1 W. Blackstone, *Commentaries* *63; *see also* materials collected in R. Aldisert, *The Judicial Process* 286–94 (1976), maritime law derives from customs at sea and therefore constitutes a separate and distinct body of law. *See* E. Jhirad, A. Sann, B. Chase & M. Chynsky, *Benedict on Admiralty* § 104, at 7–8, 7–9 (7th ed.1985). Only when there are no clear precedents in the law of the sea may courts "look to the law prevailing on the land." *Igneri v. Cie de Transports Oceaniques*, 323 F.2d 257, 259 (2d Cir.1963), *cert. denied*, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964).

■ Section 2 of Article III of the Constitution extends the judicial power of the United States to "all Cases of admiralty and maritime jurisdiction." U.S. Const. art. III § 2. It should prove helpful to refer briefly to the purpose and scope of this constitutional provision. The Supreme Court has reviewed its history:

As there could be no cases of "admiralty and maritime jurisdiction" in the absence of some maritime law under which they could arise, the provision presupposes the existence in the United States of a law of that character. Such a law or system of law existed in Colonial times and during the Confederation and commonly was applied in the adjudication of admiralty and maritime cases. It embodied the principles of the general maritime law, sometimes called the law of the sea, with modifications and supplements adjusting it to conditions and needs on this side of the Atlantic. The framers of the Constitution were familiar with that system and proceeded with it in mind. Their purpose was not to strike down or abrogate the system, but to place the entire subject—its substantive as well as its procedural features—under national control because of its intimate relation to navigation and to interstate and foreign commerce. In pursuance of that purpose the constitutional provision was framed and adopted. Although containing no express grant of legislative power over the substantive law, the provision was regarded from the beginning as implicitly investing such power in the United States. Commentators took that view; Congress acted on it, and the courts, including this Court, gave effect to it. Practically therefore the situation is as if that view were written into the provision. After the Constitution went into effect, the substantive law theretofore in force was not regarded as superseded or as being only the law of the several States, but as having become the law of the United States,—subject to power in Congress to alter, qualify or supplement it as experience or changing conditions might require.

*Panama R.R. Co. v. Johnson*, 264 U.S. 375, 385–86, 44 S.Ct. 391, 393–94, 68 L.Ed.2d 748 (1924). Sixty-two years later the Court summarized the context and application of admiralty law:

With admiralty jurisdiction comes the application of substantive admiralty law. See *Executive Jet Aviation, [Inc. v. Cleveland,]* 409 U.S. [249, 255, 93 S.Ct. 493, 498, 34 L.Ed.2d 454 (1972)]. Absent a relevant statute, the general maritime law, as developed by the judiciary, applies. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 409 [95 S.Ct. 1708, 1714, 44 L.Ed.2d 251] (1975); *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 160–161 [40 S.Ct. 438, 440, 64 L.Ed.2d 834] (1920). Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules. See *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 [79 S.Ct. 406, 409, 3

L.Ed.2d 550] (1959); *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 373–375 [79 S.Ct. 468, 480–482, 3 L.Ed.2d 368] (1959). This Court has developed a body of maritime tort principles, see *e.g., Kermarec, supra,* [358 U.S.] at 632 [79 S.Ct. at 410]; see generally Currie, Federalism and the Admiralty: "The Devil's Own Mess," 1960 S.Ct.Rev. 158, 164 ....

*East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864–65, 106 S.Ct. 2295, 2298–99, 90 L.Ed.2d 865 (1986) (footnote omitted). Added to the foregoing are the familiar precepts that state law may supplement maritime law when maritime law is silent or where a local matter is at issue, but state law may not be applied where it would conflict with maritime law. *See Coastal Iron Works, Inc. v. Petty Ray Geophysical,* 783 F.2d 577, 582 (5th Cir. 1986) (collecting cases); *see generally Benedict on Admiralty, supra,* § 105, at 7–12, 7–13.

### V.

Having established that maritime law emanates from customs of the sea, we now turn briefly to those customs respecting burial at sea. In the leading federal sea-burial decision, *Brambir v. Cunard White Star, Ltd.,* 37 F.Supp. 906, 907 (S.D.N.Y. 1940), *aff'd mem.,* 119 F.2d 419 (2d Cir. 1941), plaintiff's decedent was a passenger who died on board a passenger liner that was eight days from its destination. The ship's master did not embalm the body, and buried the decedent at sea the second day after his death without notifying the decedent's next-of-kin. The court dismissed plaintiff's complaint, which alleged an "unlawful interference with and violation of the plaintiff's right to accord her deceased husband a decent burial." 37 F.Supp. at 906. The court stated that "the master of a ship has an absolute discretion as to the proper disposition of the corpse. The custom of burial at sea has long been sanctioned by usage." *Id.* at 907. The court noted that a person who books passage on an ocean-going steamer impliedly acquiesces to be bound by the custom of the sea and "consents to burial therein in the event of death during the voyage." *Id.*

In *White–Jacket or The World in a Man–of–War* 320 (1892), Herman Melville penned this moving passage:

### HOW THEY BURY A MAN–OF–WAR'S–MAN AT SEA.

QUARTERS over in the morning, the boatswain and his four mates stood round the main hatchway, and after giving the usual whistle, made the customary announcement—"*All hands bury the dead, ahoy!*"

In a man-of-war, everything, even to a man's funeral and burial, proceeds with the unrelenting promptitude of the martial code. And whether it is *all hands bury the dead!* or *all hands splice the main-brace,* the order is given in the same hoarse tones.

Both officers and men assembled in the lee waist, and through that bareheaded crowd the mess mates of Shenly brought his body to the ... gangway.... But there is something in death that ennobles even a pauper's corpse; and the Captain himself stood bareheaded before the remains of a man....

"*I am the resurrection and the life!*" solemnly began the Chaplain, in full canonicals, the prayer-book in his hand....

"*We commit this body to the deep!*" At the word, Shenly's mess-mates tilted the board, and the dead sailor sank in the sea.

"Look aloft," whispered Jack Chase. "See that bird! it is the spirit of Shenly."

Gazing upward, all beheld a snow-white solitary fowl, which—whence coming no one could tell—had been hovering over the main-mast during the service, and was now sailing far up into the depths of the sky.

Accounts of sea-burials can be found in many classics: H. Melville, *Billy Budd, Sailor;* W. Stafford, *Melville's Billy Budd & the Critics* 61–63 (1961); J. Conrad, *The Nigger of the Narcissus* 73–79 (1959); C.S. Forester, *Captain Horatio Hornblower* 129, 173–75 (1939). Other recent tales of the sea contain similar references: J. Hanley, *Captain Bottell* 144–57 (1933); N. Monsarrat, *The Cruel Sea* 268–75 (1952).

These accounts are a staple in historical chronicles of sea life: L. Anderson, *Story of Allan Gordon* 113–18 (1893); H. Bailey, *Shanghaied Out of 'Frisco in the 'Nineties* 136–53 (n.d.); J. Barker, *The Log of a Limejuicer* 206–11 (1936); A. Fischer, *Foc'sle Days* 46–51 (1947); G. Gowllend, *Master of the Moving Sea* 119–20 (1959); W. Strickland, *Journal of a Tour in the United States of America: 1794–1795* 25–26 (1971). Literature and art, to be sure, reflect the mores and customs of the culture of which they are a part.

Notwithstanding appellant's claims to the contrary, the custom of burial at sea is also recognized both in current master and vessel handbooks, and in various medical guides for vessels at sea. Whichever handbook or guide a master consults in seeking advice upon the death of a seaman, he will find a passage discussing the option of burial at sea. *See* E. Turpin & W. MacEwen, *Merchant Marine Officer's Handbook* 21–27 (1979); United States Department of Health, Education and Welfare, *The Ship's Medicine Chest and Medical Aid at Sea* 358–59 (1978); World Health Organization, *International Medical Guide for Ships* 337 (1967); W. Wheeler, *Medical Care of Merchant Seamen* 24–25 (1945).

### VI.

The appellant seems to concede the foregoing and rests her case on the common law precept that "the duty to deliver a decedent's body to the next of kin is recognized in state common law and this duty should be incorporated into the general maritime law." Br. for appellant at 15. She relies on a number of state tort cases, of which *Blanchard v. Brawley*, 75 So.2d 891 (La.Ct.App.1954), is representative, holding that the nearest relative or next-of-kin of the deceased possesses a quasi-property right in the body, and that this right is "predicated on the universally recognized duty of relatives to bury their dead, which duty involves the right to possession and custody of the body for purposes of burial or sepulchre in the same condition that existed at the moment life departed." *Id.* at 893.

Floyd believes that maritime law today will embrace these land-law state tort concepts. But the authorities she cites relate to land-based deaths, not to a formal burial at sea on a homeward-bound vessel that is eight days from its next scheduled port-of-call. The best authority that appellant can muster is a 1917 decision of the New York Court of Appeals, *Finley v. Atlantic Transport Co.*, 220 N.Y. 249, 115 N.E. 715 (Ct.App.1917), that permitted a cause of action. But the facts there do not resemble the case at hand. As described by the court:

> [D]efendant in the operation of a first-class steamship had supplied a person qualified to embalm the body of the deceased and had provided a suitable place for the storage of the same; that the body was kept in a perfect state of preservation and made proof against decomposition for a period greatly exceeding the time ordinarily occupied by the voyage from the point where the steamship was at the time of death and the city of New York. Having embalmed the body, defendant continued to carry the same until about 5 p.m. July 6, 1913, a period of upwards of 4 days, when defendant buried it at sea in or near Nantucket Shoals at a time when the steamship was about 20 hours from port.

115 N.E. at 717. Moreover, in *Finley* there was no indication that a formal burial-at-sea ritual was performed.

Appellant cites no state statute prohibiting the formal ritual of burial at sea. She does not rely on any federal law that operates to change the centuries-old custom of burial at sea. Numerous changes in maritime law have taken place since the court in 1940 decided the leading case of *Brambir v. Cunard White Star, Ltd.*, yet no case and no statute contradict *Brambir's* holding that "in [a death at sea] it would seem that the master of the ship has an absolute discretion as to the proper disposition of the corpse." 37 F.Supp. at 907. Indeed, our research has unearthed only one other reported case, and it supports the customs of the sea. *See O'Neill v. Compagnie Generale Transatlantique*, 1937 A.M.C. 1129 (S.D.N.Y.1937).

In *O'Neill*, Elizabeth Ann Ahearn, a passenger on the *S.S. Ile de France*, died of

natural causes while the vessel was enroute to New York. The ship's crew did not discover the body for 14 hours, and the on-board physicians concluded that it could not be embalmed. Eleven Roman Catholic priests subsequently celebrated a requiem mass, and the body was buried at sea when the vessel was 650 miles from New York. Four cousins brought suit for damages because the ship's crew did not embalm the body and bring it to port for interment in consecrated ground ashore. The court, in allowing the case to go to a jury, instructed the jurors that the carrier was not required to do more than give the body a decent burial, and admitted testimony as to what was a proper burial. The jury thereafter returned a verdict for the defendant. It will be noted that *O'Neill* preceded the adoption of the summary judgment procedure in federal courts, Rule 56, F.R.Civ.P., which took effect on September 16, 1938.

Nothing in the Death on the High Seas Act, 46 U.S.C. §§ 761–768, or the Jones Act, 46 U.S.C. § 688, two statutes that deal with a seaman's death at sea, precludes burial at sea. Furthermore, in 1983, Congress revised Title 46 of the United States Code, which contains the statutory law relating to United States flag vessels and seamen, to outline the disposition of a deceased seaman's personal effects. Appellant fails to point to anything in that revision which supports her cause of action. *See* 46 U.S.C. §§ 10701–10711. Although Congress at the time of these amendments undoubtedly discussed the subject of seamen dying at sea, it did not enact any legislation precluding the time-honored custom of burial at sea or requiring the return of the body of someone who dies at sea. Therefore, appellant has failed to produce any statutory evidence to support her argument that a cause of action for burial at sea would now be appropriate "to effectuate the policies of general maritime law." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 400, 90 S.Ct. 1772, 1787, 26 L.Ed. 2d 339 (1970).

## VII.

In essence, appellant's entire argument rests on a single premise: No case law or statute supports my theory, but this court should rely on a single sentence contained in a publication issued by the United States Public Health Service entitled *The Ship's Medicine Chest and Medical Aid at Sea.* According to this authority, "[t]oday burial at sea is the exception." *See* app. at 194. But the *Ship's Medicine Chest* provides no support or explanation for this assertion. The authors do not tell us that this is so because modern medicine and surgical procedures make death at sea the exception, or that sailing vessels are now equipped with embalmers and morgues to obviate the necessity of a sea burial.

From this single quotation from a how-to-do ship's handbook, appellant anchors her argument that burial at sea is anachronistic and improper when the next-of-kin are not notified in advance. Phrased in legal terms, Floyd argues that the ship's master abused his discretion when he failed to dock the vessel in an African or European port for a land burial or refused to refrigerate the remains, possibly in the vessel's food locker, until the ship arrived at its home port. So construed, her argument may be considered a request that we reject the rule formulated in *Brambir,* that the ship's captain has "absolute discretion," and promulgate a standard that vests in the ship's master something less than absolute discretion.

Those who exercise discretion do not all enjoy the same freedom and latitude, for in the law there is wide, less wide, and narrow discretion. Professor Rosenberg teaches that discretion runs the gamut from "Grade A ... a type that is ... unreviewable and unreversible" to "Grade D, extremely dilute discretion." M. Rosenberg, *Appellate Review of Trial Court Discretion* 9–14 (1975) (Federal Judicial Center). *Brambir* obviously gives the ship's captain "Grade A" discretion, and appellant essentially urges us to conclude that he now possesses a less draconian power. But even if we succumb to appellant's invitation, it would be of little help here. For where the discretionary power is not absolute, the standard of review would be analogous to an appellate court's review

of a trial court's exercise of discretion. The universal standard of review in this circumstance is abuse of discretion, or whether the trial court's action was "arbitrary, fanciful or unreasonable," to use a formulation we have applied on numerous occasions. *See, e.g., Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir. 1976) (in banc) (*Lindy II*).

■ We do not find it necessary to decide whether, in 1988, we should depart from *Brambir's* 1940 notion of the ship captain's absolute discretion. Even if we assume, without deciding, that the discretion of a ship's master is somewhat less than unreviewable and adopt instead the concept we apply in reviewing judicial discretion, "that discretion is abused only when no reasonable man [or woman] would take the view adopted by [the decisionmaker]." *Lindy II*, 540 F.2d at 115 (quoting *Delno v. Market St. Ry.*, 124 F.2d 965, 967 (9th Cir.1942)). Under such a standard, we would find no abuse in the present case.

Appellant presented no evidence that the *Shirley Lykes* had trained embalmers among its crew, or had a ship's morgue with adequate refrigeration facilities to preserve the remains after embalming. Floyd did not represent that the family would have been willing to designate a consignee at an African or European port to receive the un-embalmed remains or that the foreign country or city would accept delivery of the cadaver. Nor did she represent that the family was willing to compensate the shipping company for losses caused by delays in arriving at its scheduled destination after making an unplanned stop. Faced with the record in this case, we would not describe the captain's decision for a sea burial as arbitrary, fanciful, or unreasonable.

It bears emphasis that we are deciding the present case based only on the facts before us. Although the substantive law here is maritime, our decisionmaking process follows the common law tradition of deciding only specific cases or controversies. Thus, our holding here is simply a "precept[ ] attaching a definite detailed legal consequence to a definite, detailed state of facts." *United States v. Criden*, 633 F.2d 346, 354 n. 4 (3d Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed. 2d 842 (1981) (quoting Pound, *Hierarchy of Sources and Forms in Different Systems of Law*, 7 Tulane L.Rev. 475, 482 (1933)).

### VIII.

From our stated views, we conclude that there was no genuine issue of material fact to preclude the grant of summary judgment for the defendant. The judgment of the district court will be affirmed.