707 A.2d 193

HOWARD GOLDSON AND CONTINENTAL INSURANCE COMPANY, AS SUBROGEE, PLAINTIFFS–APPELLANTS, v. CARVER BOAT CORPORATION, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO BERTRAM–TROJAN, INC., AND JOHNSON & TOWERS, INC., DEFENDANTS–RESPONDENTS, AND GENERAL MOTORS CORPORATION, BOB MASSEY YACHT SALES, INC., POINT PLEASANT IRON WORKS AND CLARK'S LANDING MARINA, JOINTLY, SEVERALLY AND/OR IN THE ALTERNATIVE, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Submitted March 11, 1998—Decided March 31, 1998.

Before Judges BAIME, BRAITHWAITE and BILDER.

*Bivona, Cohen, Kunzman, Coley, Yospin, Bernstein & DiFrancesco*, attorneys for appellants (*Stephen J. Bernstein*, on the brief).

*McOmber & McOmber*, attorneys for respondent Carver Boat Corporation (*J. Peter Sokol*, of counsel and on the brief).

*Hollstein, Keating, Cattell, Johnson & Goldstein,* attorneys for respondent Johnson & Towers, Inc. (*E. Michael Keating, III,* and *James D. Lloyd,* on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

■ At issue is whether plaintiff Howard Goldson and his subrogee Continental Insurance Company (Continental) may recover from defendants Carver Boat Corporation (Carver) and Johnson & Towers, Inc. (Johnson & Towers) in negligence and strict liability for economic loss caused by a defect in a power boat that caught fire while docked at a marina. Plaintiff had purchased the boat "as is" at a public auction with full disclaimers of all express and implied warranties. We must decide whether a cause of action in tort was stated where the only damage caused by the defect was to the product itself. We hold that under both federal admiralty principles and New Jersey decisional law the economic loss resulting from the product defect was not subject to tort remedies.

## I.

On May 13, 1992, plaintiff purchased a 1987 model Trojan convertible forty foot powerboat at a public sale. The boat was manufactured by Bertram–Trojan, Inc. in 1986, and was sold to the original purchaser under a security agreement. The boat was repossessed in 1992 and sold to plaintiff in its "as is" condition the following year. Before buying the boat, plaintiff had it inspected by a marine surveyor who in his report identified its twin engines as having been converted to maritime use by Johnson & Towers.

Several months prior to the sale, Bertram–Trojan filed a voluntary petition for bankruptcy seeking Chapter 11 reorganization in the United States Bankruptcy Court for the Southern District of Florida. The district court subsequently approved the sale of Trojan Division's name and assets to Carver, "free and clear of any and all liens, encumbrances, or restrictions of any kind." The

order recited that Carver was not "bound by or liable for, any claims, warranties, obligations, suits against or liabilities of the Debtor ... of any kind or nature, whether absolute, accrued, contingent or otherwise and whether due or to become due...."

On August 19, 1993, plaintiff and his son completed a "long hard run" from Port Washington to Montauk, Long Island. When they arrived at their destination, plaintiff docked the boat at the Montauk Yacht Club. According to plaintiff, the boat had performed well, and he had not noticed any problems or malfunctions during the passage. After registering the boat with the club, plaintiff returned and noticed a spark emanating from the engine compartment. Upon opening the forward hatch, plaintiff found the engine compartment enveloped in smoke. The fire department and Coast Guard were summoned, and were ultimately able to extinguish the fire, but the boat was severely damaged. Plaintiff subsequently sold the boat for scrap to several different salvage companies.

Paul Tobin, plaintiff's adjuster and expert, examined the remains of the boat and determined that the fire started "in the decking directly above the starboard side turbo charger." Tobin concluded the "cause of [the] loss was a fire in the decking directly above the starboard side turbo charger," and the principal problem pertained to the "improper installation of the engine." Although Tobin found "numerous contributive factors" causing the fire, the problem was accentuated by the fact that "the decking was almost touching, if not in direct contact with, the engine." Although the "failure" of the turbo charger was caused by the "[o]bvious lack of proper maintenance," Tobin concluded that the boat would "still [have been] safe from fire hazards" but for the improper installation of the engine and its proximity to the decking.

Plaintiff filed a claim against Bertram–Trojan in the bankruptcy court. The record does not disclose whether plaintiff pressed his claim or whether he was in any way successful. On January 20, 1995, plaintiff filed a complaint in the Law Division against Carver

based upon negligent design of the boat, strict liability in tort and breach of express and implied warranties. Plaintiff asserted that Carver, as successor-in-interest to Bertram–Trojan, was responsible for his economic loss consisting solely of the damage to the boat. Subsequently, on September 3, 1996, plaintiff filed an amended complaint in which he added Johnson & Towers as a defendant. Plaintiff asserted that Johnson & Towers improperly "marinized" the boat's engines, which had been manufactured by General Motors Corp. Plaintiff's claims against Johnson & Towers mirrored those he advanced against Carver. Specifically, plaintiff asserted that Johnson & Towers negligently designed the manner in which the engines were installed and was also liable under product liability and express and implied warranty principles.

Carver and Johnson & Towers filed separate motions for summary judgment. Carver asserted that contract, rather than tort law, was applicable because the only harm suffered was to the product itself. Carver contended additionally that plaintiff's action for breach of warranty should be dismissed because the boat was purchased in its "as is" condition and because the four year statute of limitations had expired. Carver also argued that it could not be held liable as a successor-in-interest under any theory because the federal bankruptcy order provided specifically that its purchase of Bertram–Trojan's assets was "free and clear" of all claims. Johnson & Towers' approach was somewhat different. Johnson & Towers argued that federal admiralty law was preemptive, and that the doctrine of laches applicable under maritime principles impelled dismissal of plaintiff's claims.

The Law Division granted both defendants' motions for summary judgment. Applying New Jersey decisional law, the court dismissed plaintiff's claims against Carver for negligent design and strict liability in tort. Although plaintiff advanced a claim for consequential damages at argument, the court found nothing in the complaint or in the various certifications, affidavits and depositions suggesting some harm resulting from the defect other than that to the boat itself. Applying *Alloway v. General Marine*

*Industries, L.P.,* 149 *N.J.* 620, 695 *A.*2d 264 (1997), the court concluded that the principles of contract law governed. Because the boat had been purchased with complete disclaimers of all express and implied warranties, the court dismissed plaintiff's cause of action for breach of contract.

In granting Johnson & Towers' motion for summary judgment, the court applied federal admiralty law. More specifically, the court found that plaintiff's action against Johnson & Towers was barred by the doctrine of laches. The judge noted that plaintiff knew "as early as 1992" that Johnson & Towers engines were installed in the boat, because the marine surveyor specifically included this information in his report. The court concluded that Johnson & Towers had been prejudiced by the delay because it was unable to inspect the boat before it was salvaged.

Plaintiff appeals both rulings. While not contesting the Law Division's dismissal of his cause of action for breach of warranty, plaintiff argues that the defective product implicated the safety concerns inherent in tort principles. Citing *Alloway v. General Marine Industries, L.P.,* 149 *N.J.* at 638, 695 *A.*2d 264, plaintiff notes that our Supreme Court has left unresolved the question whether tort law should be applied when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself. Plaintiff argues that his tort claims against Carver are viable because the fire caused by the defective product presented a substantial danger to persons present at the scene and to other property. With respect to Johnson & Towers, plaintiff claims that he first learned of its complicity in converting the engines long after his action against Carver was instituted. Plaintiff claims that he exercised reasonable diligence in his investigation relating to the cause of the fire, and that he promptly added Johnson & Towers as a defendant upon learning of its connection with the defective product.

We affirm both summary judgments. We note, however, that the Law Division's decisions were somewhat inconsistent. In granting Carver's motion, the court applied New Jersey decisional

law. In granting Johnson & Towers' motion, the court apparently concluded that federal admiralty principles preempted New Jersey law. We are satisfied that plaintiff's causes of action were properly dismissed whether federal or New Jersey law is applied.

## II.

■ A cogent argument can be made that federal admiralty law governs this dispute. In *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 *U.S.* 249, 93 *S.Ct.* 493, 34 *L.Ed.*2d 454 (1972), the United States Supreme Court adopted a two-prong test in determining whether federal admiralty principles apply. It first must be determined whether the incident in question occurred on navigable waters. *Id.* at 268, 93 *S.Ct.* at 504, 34 *L.Ed.*2d at 467. If so, the inquiry shifts to whether the "wrong [alleged] bear[s] a significant relationship to traditional maritime activity." *Ibid.*

Although protecting commercial shipping is at the heart of admiralty jurisdiction, this test applies with equal force to pleasure and business maritime navigation. *Foremost Ins. Co. v. Richardson,* 457 *U.S.* 668, 674–75, 102 *S.Ct.* 2654, 2658, 73 *L.Ed.*2d 300, 305–06 (1982). It has thus been said that the federal interest "cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity." *Id.* at 674–75, 102 *S.Ct.* at 2658, 73 *L.Ed.*2d at 306. Instead, the concerns of commercial shipping "can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct." *Id.* at 675, 102 *S.Ct.* at 2658, 73 *L.Ed.*2d at 306. Emphasizing these concerns, the Supreme Court has applied admiralty law to a collision between two pleasure boats. *Ibid.* In reaching this conclusion, the Court said that "[t]he potential disruptive impact of a collision between boats, when coupled with the traditional concern . . . admiralty law holds for navigation," compelled this result. *Ibid.*

Significantly, the Court recently held that admiralty law was applicable to a case involving a fire that began on a noncommercial vessel docked at a marina located on a navigable waterway. In

*Sisson v. Ruby,* 497 *U.S.* 358, 110 *S.Ct.* 2892, 111 *L.Ed.*2d 292 (1990), the plaintiff's pleasure boat caught fire while docked at a Lake Michigan marina. *Id.* at 360, 110 *S.Ct.* at 2894, 111 *L.Ed.*2d at 298. Although the fire spread to several neighboring pleasure boats, no commercial vessels were docked at the marina. *Id.* at 360, 363, 110 *S.Ct.* at 2894, 2896, 111 *L.Ed.*2d at 298, 300. The Court stressed that "[t]he jurisdictional inquiry [did] not turn on the *actual* effects [of the fire] on maritime commerce," nor on "the particular facts of the incident . . . such as the source of the fire or the specific location of the yacht at the marina." *Id.* at 363, 110 *S.Ct.* at 2896, 111 *L.Ed.*2d at 300. Instead, the Court stressed that fire has traditionally been considered "one of the most significant hazards facing commercial vessels." *Id.* at 362, 110 *S.Ct.* at 2896, 111 *L.Ed.*2d at 299. The Court thus found that the "general features [of the case]—a fire on a vessel docked at a marina on navigable waters"—satisfied the "locality" test because of the "potential disruption to commercial maritime activity." *Id.* at 363, 110 *S.Ct.* at 2896, 111 *L.Ed.*2d at 300. The Court also concluded that a significant relationship existed between the alleged wrong and traditional maritime activity. *Id.* at 367, 110 *S.Ct.* at 2898, 111 *L.Ed.*2d at 302. "[T]he storage and maintenance of a vessel at a marina on navigable waters [was said to bear] a substantial[ ] relat[ionship] to a 'traditional maritime activity' " sufficient to warrant application of admiralty principles. *Ibid.* In that respect, the Court said that "[d]ocking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity." *Ibid.*

The facts here strongly resemble those in *Sisson.* The only distinguishing feature is that, unlike *Sisson,* the fire was confined to plaintiff's boat and did not spread to other vessels. It is at least arguable, however, that the fire had a potentially disruptive effect on commercial maritime activity. Under the test adopted in *Executive Jet Aviation,* and applied in *Sisson,* we are not to define the relevant incident in the most fact-specific way. Instead, we are obliged to ignore the minutiae of the incident, and focus upon the general conduct from which the harm resulted. *See Lewinter*

*v. Genmar Indus., Inc.,* 26 *Cal.App.*4th 1214, 1219, 32 *Cal.Rptr.*2d 305, 308 (Cal. Ct. App. 1994); *see also Delta Country Ventures, Inc. v. Magana,* 986 *F.*2d 1260, 1265 (9th Cir.1993) (Kozinski, J., dissenting).

If the two-prong test has been met, we have concurrent jurisdiction with the federal courts to apply admiralty law to the facts presented.[1] *See, e.g., Iwag v. Geisel Compania Maritima, S.A.,* 882 *F.Supp.* 597, 603 (S.D.Tex.1995) ("savings to suitors clause," 28 *U.S.C.* § 1333, allows claimants to bring admiralty actions in state courts); *Canino v. Londres,* 862 *F.Supp.* 685, 688 (D.N.H. 1994) (same); *see also* 1 Steven F. Friedell, *Benedict on Admiralty* § 123, 8–10 (6th ed.1993) (savings to suitors clause permits a plaintiff in an *in personam* action to seek common law remedies in state courts). "If a sufficient federal interest exists to justify the exercise of maritime jurisdiction, the application of [admiralty] law will follow as a matter of federal supremacy." *Anderson v. Whittaker Corp.,* 692 *F.Supp.* 764, 768 n. 2 (W.D.Mich.1988), *aff'd in part, rev'd in part,* 894 *F.*2d 804 (6th Cir.1990). Because state and federal authorities jointly exercise regulatory authority over maritime matters, *Romero v. International Terminal Operating Co.,* 358 *U.S.* 354, 372–80, 79 *S.Ct.* 468, 480–84, 3 *L.Ed.*2d 368, 382–87 (1959), there are situations in which state law may provide the relevant rule of decision in admiralty cases. *See, e.g., Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 *U.S.* 310, 321–22, 75 *S.Ct.* 368, 374, 99 *L.Ed.* 337, 346 (1955) (state law determines the effect of breach of warranty in a marine insurance policy).

Whether a state law may provide the relevant rule of decision in an admiralty case largely depends on whether the state rule "conflicts" with the substantive principles of federal admiralty

---

[1] State courts have concurrent jurisdiction over cases involving admiralty law under the "Savings to Suitors clause." 28 *U.S.C.* § 1333. That statute provides in pertinent part:

> The District Court shall have original jurisdiction, exclusive of the courts of the states, of: (1) any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

law. *Calhoun v. Yamaha Motor Corp., U.S.A.,* 40 *F.*3d 622, 627 (3rd Cir.1994), *aff'd,* 516 *U.S.* 199, 116 *S.Ct.* 619, 133 *L.Ed.*2d 578 (1996); *Floyd v. Lykes Bros. Steamship Co., Inc.,* 844 *F.*2d 1044, 1047 (3d Cir.1988); *In re Complaint of Nautilus Motor Tanker Co., Ltd.,* 900 *F.Supp.* 697, 702 (D.N.J.1995). State remedies may "supplement maritime law when maritime law is silent or where a local matter is at issue," *Floyd v. Lykes Bros. Steamship Co., Inc.,* 844 *F.*2d at 1047, but it cannot attempt to change substantive maritime law. *American Dredging Co. v. Miller,* 510 *U.S.* 443, 447, 114 *S.Ct.* 981, 985, 127 *L.Ed.*2d 285, 293 (1994) (citing *Madruga v. Superior Court of California,* 346 *U.S.* 556, 561, 74 *S.Ct.* 298, 301, 98 *L.Ed.* 290, 296 (1954) and *Red Cross Line v. Atlantic Fruit Co.,* 264 *U.S.* 109, 124, 44 *S.Ct.* 274, 277, 68 *L.Ed.* 582, 586 (1924)); *see Offshore Logistics, Inc. v. Tallentire,* 477 *U.S.* 207, 222, 106 *S.Ct.* 2485, 2494, 91 *L.Ed.*2d 174, 190 (1986); *Romero v. International Terminal Operating Co.,* 358 *U.S.* at 373, 79 *S.Ct.* at 480, 3 *L.Ed.*2d at 382 ("state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system"). This is commonly referred to as the "reverse-Erie" doctrine which, reduced to its simplest form, requires that the substantive remedies afforded by the states conform to governing federal maritime standards. *Ibid.; see* Baxter, *Choice of Law and the Federal System,* 16 *Stan. L.Rev.* 1, 34 (1963).

The substantive maritime law relating to tort recovery of economic loss is abundantly clear. In *East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 *U.S.* 858, 106 *S.Ct.* 2295, 90 *L.Ed.*2d 865 (1986), the United States Supreme Court held that, as a matter of federal admiralty law, damage solely to a defective product was not actionable in tort. *Id.* at 871, 106 *S.Ct.* at 2302, 90 *L.Ed.*2d at 877. The Court considered but rejected decisions that adopted intermediate positions, which permitted tort recovery when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself. *Id.* at 868–70, 106 *S.Ct.* at 2301–02, 90 *L.Ed.*2d at 875–76. The Court stated:

. The intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers easily to structure their business behavior. Nor do we find persuasive a distinction that rests on the manner in which the product is injured. We realize that the damage may be qualitative, occurring through gradual deterioration or internal breakage. Or it may be calamitous. But either way, since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.

[*Id.* at 870, 106 *S.Ct.* at 2301–02, 90 *L.Ed.*2d at 876 (citations omitted).]

Exercising "its traditional discretion in admiralty," the Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871, 106 *S.Ct.* at 2302, 90 *L.Ed.*2d at 877.

Applying that principle here, both Carver and Johnson & Towers were entitled to summary judgment. Plaintiff's documentary submissions disclosed no damage other than to the boat itself.[2]

### III.

We reach the same result applying New Jersey decisional law. In *Alloway v. General Marine Industries, L.P.*, 149 *N.J.* 620, 695 *A.*2d 264, our Supreme Court was confronted with a factual pattern bearing strong resemblance to that present here. The plaintiff purchased a thirty-foot Century Grande XL, a pleasure boat manufactured by Glasstream Boats, Inc. (Glasstream), in 1990. *Id.* at 633, 695 A.2d 264. Prior to plaintiff's purchase,

---

[2] In light of our decision, we need not decide whether the Law Division was correct in its application of the doctrine of laches. We add for the sake of completeness, however, that the record contains ample support for the Law Division's conclusion. Specifically, there is substantial evidence in the record supporting the court's conclusion: (1) the delay in joining Johnson & Towers as a defendant was inexcusable, and (2) prejudice resulted by reason of the delay. *See University of Pittsburgh v. Champion Products, Inc.*, 686 *F.*2d 1040, 1044 (3d Cir.), *cert. denied*, 459 *U.S.* 1087, 103 *S.Ct.* 571, 74 *L.Ed.*2d 933 (1982). *Cf. County of Morris v. Fauver*, 153 *N.J.* 80, 105–06, 707 A.2d 958, 970 (1998)(slip op. at 25–26).

Glasstream filed a voluntary petition for bankruptcy and General Marine Industries (GMI) purchased Glasstream's assets. *Ibid.* According to the bankruptcy court's order, GMI was to receive the assets "free and clear" of any claims against or interest in the property. Three months after the plaintiff purchased the boat, the vessel sank while docked at a pier in Manahawkin, New Jersey. *Id.* at 624, 695 *A.*2d 264. Plaintiff asserted that the boat sank due to a leak caused by a defective seam in the boat's swimming platform. *Id.* at 623, 695 *A.*2d 264.

Plaintiff and his insurance company brought suit against GMI as successor-in-interest to Glasstream, seeking redress for the damage to the boat. As is the case here, plaintiff's causes of action included negligent manufacture/design of the boat, strict liability and breach of warranty. *Id.* at 624, 695 *A.*2d 264. [3] Our Supreme Court expressly adopted the majority rule favoring application of the Uniform Commercial Code as the exclusive remedy for claims of purely economic loss due to a defective product. *Id.* at 629–30, 695 *A.*2d 264; *see N.J.S.A.* 12A:2–313 to – 315. The Court stated that the Code's "comprehensive scheme offers significant protection to consumers while insuring that merchants are not saddled with substantial and uncertain liability." *Id.* at 630, 695 *A.*2d 264. Thus, where the "harm suffered is to the product itself, unaccompanied by personal injury or property damage, [the Court] conclude[d] that principles of contract, rather than of tort law, [are] better suited to resolve the purchaser's claim." *Id.* at 632, 695 *A.*2d 264 (citing *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 *N.J.* 555, 580, 489 *A.*2d 660 (1985)). The Court specifically held that the economic loss doc-

---

[3] Plaintiff also argues in his brief that defendant may be held liable as a successor-in-interest to Bertram–Trojan under our Supreme Court's holding in *Ramirez v. Amsted Industries, Inc.,* 86 *N.J.* 332, 431 *A.*2d 811 (1981). We need not address the issue, however, because the trial court quite correctly granted summary judgment on the underlying substantive claims. Similarly, we need not address defendant's claim that plaintiff's suit is preempted by federal bankruptcy law.

trine was applicable to consumers and merchants alike. *Id.* at 642, 489 *A.*2d 660.

In determining that plaintiff's tort claims were barred, however, the Court expressly declined to decide whether negligence and/or strict liability claims could lie in instances where the defect poses a risk to other property or persons. Specifically, the Court left unresolved the issue whether the Uniform Commercial Code or tort law "should apply when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself." *Id.* at 638, 489 *A.*2d 660. Noting that the *Restatement (Third) of Torts: Products Liability* § 21 (Proposed Final Draft April 1, 1997) defines "economic loss" to exclude recovery under tort theories where the only damage caused by the defect is to the product itself, *id.* at 636, 489 *A.*2d 660, the Court nonetheless cited comment d, which states that "[a] plausible argument can be made that products that are dangerous [to other property or persons] . . . should be governed by the rules [applicable to] products liability law." *Id.* at 639, 489 *A.*2d 660.

Of course, we would not be required to address this question if admiralty law were applicable. The United States Supreme Court's decision in *East River* would control. But whether the incident resulting in damage to plaintiff's boat had a sufficient nexus to traditional maritime activities and concerns to warrant application of federal admiralty law is a difficult question upon which reasonable persons may disagree. We, thus, consider the question left unresolved in *Alloway*.

We are satisfied that the particular circumstances of this case do not justify application of product liability or tort remedies. Product liability grew out of a public policy judgment that people need more protection from dangerous products than may be afforded by the law of contracts and warranties. *See Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 403–04, 161 *A.*2d 69 (1960). "The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality."

*Id.* at 389, 161 *A.*2d 69. But other concerns exist where the buyer has "no real freedom of choice" and the manufacturer uses its "grossly disproportionate bargaining power" to introduce into the stream of commerce an instrumentality that, because of its defective design or construction, poses a "grave danger of injury" to other persons or property. *Id.* at 404, 161 *A.*2d 69. Thus, the "paradigmatic products-liability action is one where a product 'reasonably certain to place life and limb in peril,' distributed without reinspection, causes bodily injury" or property damage to others. *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 *U.S.* at 866, 106 *S.Ct.* at 2300, 90 *L.Ed.*2d at 874 (quoting *MacPherson v. Buick Motor Co.*, 217 *N.Y.* 382, 389, 111 *N.E.* 1050, 1053 (1916)). However, "if this development were allowed to progress too far, contract law would drown in a sea of tort." *Ibid.* (citing G. Gilmore, *The Death of Contract* 87–94 (1974)); *see also* Michael Dorff, *Attaching Tort Claims to Contract Actions: An Economic Analysis of Contort*, 28 *Seton Hall L.Rev.* 390 (1997).

Where, as here, there is no substantial disparity in bargaining power, and the only damage caused by the defective product is to the product itself, contract law, and the law of warranty in particular, is best suited to set the metes and bounds of appropriate remedies. Damage to a product itself is most naturally understood as a warranty claim because the cause of action rests on the premise that the product has not met the customer's expectation. As indicated by *N.J.S.A.* 12A:2–714(2), "[t]he measure of damages for breach of warranty is the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted...." The remedy is designed to place the purchaser in as good a position as he would have been in had the product performed as warranted. *See* J. White & R. Summers, *Uniform Commercial Code* 406 (2d ed.1980). In contrast, "tort damages generally compensate the plaintiff for loss and return him to the position he occupied before the injury." *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 *U.S.* at 873 n. 9, 106 *S.Ct.* at 2303 n. 9, 90 *L.Ed.*2d at

878 n. 9. "The demarcation of duties arising in tort and those arising in contract is often indistinct, but one difference appears in the interest protected under each set of principles." *Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 *N.J.* 555, 579, 489 *A.*2d 660 (1985). The objective of tort law is generally to protect the public's interest in freedom from harm. Tort principles are thus suited for resolving claims involving "unanticipated physical injury." *Id.* at 580, 489 *A.*2d 660. On the other hand, a contractual duty arises from society's interest in the performance of promises. Contract principles are thus appropriate for determining "claims for consequential damage that the parties have, or could have, addressed in their agreement." *Ibid.* The weight of authority "supports the proposition that economic expectations [which] are protected by the [Uniform Commercial Code] are not entitled to supplemental protection by [tort] principles." *Id.* at 581, 489 *A.*2d 660; *see also* W. Prosser and W. Page Keeton, *Handbook of the Law of Torts* § 92, at 655–57 (5th ed.1984); Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases*, 18 *Stan. L.Rev.* 974, 989–90 (1966).

Moreover, where, as here, the consumer is not at a genuine commercial disadvantage, there is greater reason to allow allocation of the loss caused by a defective product to reflect the interplay of forces in the marketplace. The parties may set the terms of their own agreements. The manufacturer or seller can restrict its liability, within limits, by disclaiming warranties or limiting remedies. *See, e.g., N.J.S.A.* 12A:2–316. In exchange, the purchaser pays less for the product. In such a case, the parties are able to allocate among themselves both the benefits and risks that inhere in their mutual promises. Thus, both the nature of the harm and the resulting damages "indicate it is more natural to think of injury to a product in terms of warranty." *East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 *U.S.* at 874, 106 *S.Ct.* at 2303, 90 *L.Ed.*2d at 879.

The consumer here is a purchaser of an expensive luxury boat. His bargaining power was substantially equivalent to that of the

seller. As previously mentioned, plaintiff purchased the boat "as is" at a public sale. Although plaintiff purchased the boat for $125,000, the marine survey indicated that the boat was worth approximately $175,000. The survey was exhaustive, to say the least, and plaintiff was fully apprised of the boat's condition prior to consummating the deal. Under these circumstances, we are content to allow the loss to remain where the forces of the marketplace placed it.

Affirmed.