752 A.2d 807 (2000)
332 N.J. Super. 31
Paul VARACALLO, individually and on behalf of his minor child, Lisa F. Varacallo, and on behalf of all other persons similarly situated, Plaintiffs-Appellants,
v.
MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 22, 2000.
Decided June 14, 2000.
*808 Bruce D. Greenberg, for plaintiffs-appellants (Lite, DePalma, Greenberg & Rivas, Newark, and Joseph N. Kravec, Jr.; Specter, Specter, Evans & Manogue of Pennsylvania bar, admitted pro hac vice, Pittsburgh, PA, attorneys; Mr. Greenberg and Mary Jean Pizza, Newark, on the brief).
Robert J. Del Tufo, Trenton, for defendant-respondent (McCarter & English, and Skadden, Arps, Slate, Meagher & Flom, attorneys, Newark; Vaughn C. Williams, Stanley Chinitz, Elliot Rothstein, New York City, and Mr. Del Tufo, on the brief).
Before Judges HAVEY, KEEFE, and A.A. RODRIGUEZ.
The opinion of the court was delivered by KEEFE, J.A.D.
We granted plaintiffs' motion for leave to appeal the Law Division's denial of their class certification motion. Plaintiffs' motion sought to certify a class of all New Jersey residents who purchased so-called "vanishing premium" whole life insurance policies from defendant Massachusetts Mutual Life Insurance Company (Mass Mutual) during the period of 1985 to 1989. The sole issue to be resolved on appeal is whether the Law Division erred in denying plaintiffs' motion on the ground that individualized issues of causation and reliance predominate over common issues of law and fact as to the members of the class.
Plaintiffs' complaint alleged various theories of recovery against Mass Mutual. By the time the subject motion was argued, however, plaintiffs' theories were reduced to their contention that Mass Mutual was liable for common law fraud and violation of the Consumer Fraud Act.
*809 N.J.S.A. 56:8-1 to -48. The motion judge denied class certification finding that, while plaintiffs met the requirements of R. 4:32-1(a), they failed to meet the predominance requirement of R. 4:32-1(b). We respectfully disagree with the motion judge's analysis and reverse the judgment under review.
The vanishing premium concept of whole life policies is not unique to Mass Mutual. Other insurance companies have employed the same concept. Mass Mutual refers to its product as an "N-Pay" policy. The concept is best described in its own literature as follows:
N-Pay is a strategy for shortening the number of years you have to pay out-of-pocket premiums to complete your permanent plan of life insurance protection.
....
The objective is to allow you to pay premiums out of pocket for a limited number of years only (until such time as dividends can completely fund your plan).
....
The N-Pay period depends on dividend results, which are not guaranteed.*
In fact, the "N" in "N-Pay" stands for the earliest possible year after which the dividends and paid-up additions (based on our current dividend scale, which is not guaranteed) will pay future premiums while maintaining the full original face amount of the policy.
The asterisks appearing in the quote above direct the reader to the following note in fine print.
Dividends are based on current dividend schedule, not guaranteed. Dividends reflect current investment, mortality, expense and federal income tax experience of the Company. Changes in current experience can subject dividends to significant fluctuations.
Mass Mutual sells life insurance policies through general agents that are independent contractors. During the period of January 1985 through December 1989, it issued more than 8,250[1] policies to New Jersey residents through 840 licensed agents.
Plaintiff Paul Varacallo purchased "N-Pay" life insurance policies issued by Mass Mutual as early as 1983, insuring his life and the life of his wife Catherine and daughter Christine. The policies were purchased through Sidney Schnipper, an agent of Mass Mutual. In 1989, he purchased another "N-Pay" policy for his daughter Lisa through Norman Broad, a Mass Mutual agent, because Schnipper was about to retire and could no longer maintain Varacallo's account. Under the 1989 policy, it was projected that Varacallo would be required to pay an annual premium of $150 for thirteen years, at which time the obligation to pay the annual premium would expire. The "HYPOTHETICAL POLICY ILLUSTRATION" issued by Mass Mutual dated May 11, 1989, cautioned that "A DIVIDEND CHANGE MAY INCREASE THE NUMBER OF CASH PREMIUM PAYMENTS." (Emphasis added.) On the last page, the illustration explained:
ALL DIVIDENDS, INCLUDING THE FIRST, ARE BASED ON CURRENT DIVIDEND SCHEDULE, WHICH IS NOT GUARANTEED. SUBSEQUENT TRANSFER OF OWNERSHIP TO A QUALIFIED PENSION OR PROFIT SHARING PLAN MAY RESULT IN A CHANGE IN DIVIDENDS. DIVIDENDS REFLECT CURRENT INVESTMENT, MORTALITY, EXPENSE, AND FEDERAL INCOME TAX EXPERIENCE OF THE COMPANY. CHANGES IN CURRENT EXPERIENCE CAN SUBJECT DIVIDENDS TO SIGNIFICANT FLUCTUATIONS.
The language in Varacallo's illustration of May 1989 is exactly the same as the language contained in the individual illustrations for policyholders issued by Mass Mutual *810 for use by its authorized agents in the years 1985, 1986, 1987, and 1988.
In March 1996, Varacallo requested and received from Mass Mutual an in-force policy illustration for Lisa's policy. The illustration informed Varacallo that the annual premium obligation would not be extinguished until the eighteenth year, rather than the thirteen years that had been originally projected. The in-force policy illustration contained the same language that "A DIVIDEND CHANGE MAY INCREASE THE NUMBER OF CASH PREMIUM PAYMENTS." But it also contained the following language that was not present in the hypothetical point of sale illustrations used in 1985 through 1989.
ILLUSTRATED DIVIDENDS ARE NEITHER ESTIMATES NOR GUARANTEES, BUT ARE BASED ON OUR 1996 DIVIDEND SCALE. DIVIDENDS IN FUTURE YEARS MAY BE LOWER OR HIGHER, DEPENDING ON THE COMPANY'S ACTUAL EXPERIENCE. DUE TO THIS FACT, WE STRONGLY RECOMMEND YOU LOOK AT A LOWER SCALE ILLUSTRATION.
BASED ON THE 1996 DIVIDEND SCHEDULE FOR POLICIES WITH ADJUSTABLE POLICY LOAN RATE PROVISION. DIVIDENDS ARE NOT GUARANTEED AND CAN FLUCTUATE SIGNIFICANTLY. WE STRONGLY RECOMMEND YOU LOOK AT AN ILLUSTRATION SHOWING A LOWER DIVIDEND SCALE. THIS ILLUSTRATION IS NEITHER A PROJECTION NOR AN ESTIMATE OF FUTURE RESULTS. TRANSFER OF POLICY OWNERSHIP TO A QUALIFIED PENSION OR PROFIT SHARING PLAN COULD RESULT IN A DIFFERENT DIVIDEND SCHEDULE.
Varacallo then filed this lawsuit.
Plaintiffs' claim is based upon extensive discovery which we can briefly summarize. Mass Mutual's 1985 Actuarial Report stated that its dividend rate for that year was 12.2%, whereas its portfolio of assets was only earning 10.45%. In a March 4, 1985 internal memorandum, Michael E. DuBois, Assistant Actuary for Mass Mutual, addressed the possible actions Mass Mutual would "take if interest rates continue[d] to decline." In the memorandum, DuBois stated that " `tough[ing] it out' " given the declining portfolio rates "may only be putting off the inevitable dividend decrease." Approximately three months later, Isadore Jermyn, Second Vice President and Actuary, requested that DuBois "prepare a memorandum arguing that dividends on traditional products are not being artificially supported."
The widening gap between the rate used to pay out dividends and the rates earned on its portfolio was a significant problem for Mass Mutual as recognized by Thomas B. Wheeler, Executive Vice President. In a June 1986 memo to Walter L. Grace, Senior Vice President and Actuary, Wheeler asked Grace for assistance in "developing a plan that would extricate [Mass Mutual] from [its] present dividend position." In an April 1987 memo, Wheeler requested Kenneth L. Fry, Jr. to prepare strategic material for the June Dividend Policy Committee meeting that would bring the dividend rate in line with the portfolio rate. One suggested approach was to "shift[ ] more to a value- or needs-oriented approach to the market, rather than having to artificially support a product." A June 1987 memo outlined a concept of moderately "ratcheting down" dividend rates starting in 1988. A January 5, 1988 Mass Mutual document titled "Dividend Ratcheting" reflects December baseline rates for the years 1987 through 1994 that correlates closely with rates reflected in a graph of "N-Pay" policies issued in 1986. Jermyn advised Grace not to address "the concept of ratcheting down" dividend actions at the "May, 1987[sic] Field Planning Rally."
In deposition testimony, Wheeler, the Chief Executive Officer at the time, stated *811 that he did not think Mass Mutual informed its agents "of the impact [ ] prevailing rates [had] on its portfolio rates." This was confirmed by Norman Broad who testified that Mass Mutual would not "discuss their anticipated investment experience" or "anticipated dividend scales" with its agents. Agents would be informed of actual changes in the dividend rate when Mass Mutual publicly announced those changes.
In regulatory filings dated February 20, 1987, February 2, 1988, and December 21, 1988, Mass Mutual reported that current market rates could cause it to reassess "the aggregate level of dividends [paid] for future years" and could be less than "the dividends illustrated on new or existing business." This response was filed on the basis that Jermyn "anticipate[d] that [Mass Mutual would] need a dividend reduction in either 1989 or 1990." The importance of accurate responses to these regulatory filings was expressed in DuBois' earlier March 1985 memo to Jermyn, stating that if Mass Mutual chose to " `tough [ ] out' " the current interest rate environment, it "would have to reveal through Schedule M's ... general interogatory [sic] that we are propping up our dividends[,]" which "could raise [a] question of misrepresentation, especially with regard to illustrated dividends."
In 1993, Mass Mutual added the following cautionary language to one of its "N-Pay" illustrations: "Due to lower market interest rates, dividends based on the 1995 dividend scale are likely to be lower than those shown. We strongly recommend you look at a lower scale illustration. Dividends may be lower or higher in the long term." (Emphasis added.) This language tracks Mass Mutual's 1993 Schedule M Supplement filing, wherein it reported that "there [was] a substantial probability that ... the dividends illustrated on new or existing business [could not] be supported for at least two years."
The "N-Pay" policy illustrations prior to 1993 were essentially the same as Varacallo's illustration, which cautioned only that the "CURRENT DIVIDEND SCHEDULE" was "NOT
GUARANTEED" and "A DIVIDEND CHANGE MAY INCREASE THE NUMBER OF CASH PREMIUM PAYMENTS." The illustrations provided a schedule of premium payments and available death benefits by year, that were computer-based models programed centrally by Mass Mutual and made available to its agents in the field offices prior to 1990 and via personal computer software thereafter. The projections of premium payments and the year the premium obligation expired were based on "MassMutual's then current level of dividends" as required by New Jersey insurance regulations.[2]
When Varacallo purchased the policy for his daughter Lisa in 1989, he met with Norman Broad. Varacallo stated in deposition testimony that he relied on the "selfexplanatory" illustrations and understood that the dividends would be used to pay his ongoing premiums after the premium vanished. He explained that Broad showed him the chart, but did not discuss the dividend schedule and that anything Broad said "didn't register" to him because "Norman Broad meant nothing to me." He explained that he had purchased four other policies and his decision to purchase the 1989 policy was "based on the information that [Mass Mutual] gave [him] on" the sales illustration.
Varacallo also testified that Broad discussed with him certain aspects of Lisa's *812 policy that was similar to the other Mass Mutual policies he purchased. Specifically, the fact that the dividends may go up or down and that he wouldn't have to pay any out-of-pocket money after a certain number of years. Varacallo recalled reading the disclaimer that a change in the dividend rate may affect the number of payments. His understanding of that language with respect to the previous policies he purchased was that if dividends should decline it could "increase [his] out-of-pocket expenses" requiring him "to pay for additional years." He stated that Broad advised him that " `if there was a drastic reducement [sic] in dividends ... [he] would have to pay more out-of-pocket.' "
As to the 1983 and 1986 policies, Varacallo "was told [by Sidney Schnipper] that if we had a depression or something, I might have to pay a year or two more[,]" but it was " `not likely to happen.' " He could not recall reading certain language in the illustration such as "[d]ividend schedules are not guaranteed." However, Varacallo knew that economic conditions could cause interest rates to vary, which could extend the premium obligation from eight years to ten years. He also stated that having "to pay a year or two more ... would still be fine with [him]."
Broad testified that he discussed the premium illustration for the 1989 policy with Varacallo and "mentioned to him that it might change if the dividend scale changed." According to Broad, Varacallo understood that the illustration was based on the "current dividend scale" and that the premium obligation could be extended "if the dividend scale changed."
Plaintiffs' claim is rather straightforward. They allege that Mass Mutual withheld material information from its printed literature during the relevant period. Essentially, plaintiffs contend that Mass Mutual knowingly and intentionally inflated its dividend rates to support the sale of its N-Pay policies, knowing "that there was a substantial probability [it] couldn't be maintained even for two years." Further, plaintiffs claim that Mass Mutual concealed "its plan to reduce dividends that it knew were insupportable even as it sold insurance policies based on illustrations and other marketing materials that showed illustrated rates remaining constant for 20 or more years into the future...." Plaintiffs also assert that this information was not revealed to its agents who used Mass Mutual's prepared illustrations in selling the N-Pay policies. Accordingly, they do not claim that the agents knowingly withheld material facts.
Thus, in a nutshell, plaintiffs claim they were presented with written illustrations prepared by Mass Mutual that omitted material information, which if disclosed would had conveyed the notion that there was a substantial probability that the rates illustrated "would not last even for two years." As a result of this failure to disclose, policyholders were induced to purchase the N-Pay policies while Mass Mutual knew to a virtual certainty that the forecasted returns would not come to pass. Further, according to plaintiffs, Mass Mutual knew that policyholders, once having purchased a policy, would continue paying annual premiums years after the obligation was projected to expire. In summary, plaintiffs' proposed class includes all New Jersey residents who purchased N-Pay policies between 1985 and 1989 from agents who used Mass Mutual's written sales illustrations.
The certification of a class is governed by the requirements of Rule 4:32-1, which is modeled after its federal counterpart Rule 23(a) and (b). In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 424-25, 461 A.2d 736 (1983). Here, the motion judge found that plaintiffs met the four initial requirements of Rule 4:32-1(a), specifically: "numerosity, commonality, typicality, and adequacy of representation." Id. at 425, 461 A.2d 736. Neither party takes issue with the judge's findings or conclusions of law with regard to those initial requirements.
*813 In addition to meeting the initial requirements of Rule 4:32-1(a), the party seeking to certify the class must also satisfy one of the three criteria enumerated in Rule 4:32-1(b). In the present case, plaintiffs maintain that they have satisfied the requirements of (b)(3):
that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include: first, the interest of members of the class in individually controlling the prosecution or defense of separate actions; second, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; third, the difficulties likely to be encountered in the management of a class action.

[R. 4:32-1(b)(3).]
In short, "the movant must demonstrate both the predominance of the common issues and the `superiority' of a cause of action over other available trial techniques." Saldana v. City of Camden, 252 N.J.Super. 188, 196, 599 A.2d 582 (App. Div.1991).
The motion judge was required to give plaintiffs "every favorable view" of plaintiffs' complaint and the record. Riley v. New Rapids Carpet Ctr., 61 N.J. 218, 223, 294 A.2d 7 (1972); Delgozzo v. Kenny, 266 N.J.Super. 169, 181, 628 A.2d 1080 (App.Div.1993)(" `[t]he court is bound to take the substantive allegations of the complaint as true' ")(quoting Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976)). In addition to the pleadings, the discovery taken in the matter is relevant. The evaluation of the legal and factual issues underlying a class certification motion, however, should be "less penetrating" as compared to "a motion for summary judgment or at trial." In re Cadillac, supra, 93 N.J. at 426, 461 A.2d 736.
When considering the issue of predominance, it is necessary to analyze the movant's underlying theories of liability, the proofs necessary to establish them, and the predictable defenses to the legal claims. Ibid.; Saldana, supra, 252 N.J.Super. at 197, 599 A.2d 582. Where, as here, "a `common nucleus of operative facts' is present, predominance may be found." In re Cadillac, supra, 93 N.J. at 431, 461 A.2d 736 (quoting 7A Wright & Miller, Federal Practice & Procedure § 1778 at 53 (1972)).
Plaintiffs have alleged two theories of liability, common law fraud and a violation of the Consumer Fraud Act. In order to establish a cause of action under common law fraud, plaintiffs must demonstrate that: (1) defendant made a material misrepresentation or omission of fact; (2) knowing the misrepresentation to be false or the omission to be material, and intending the other party to rely on it; and (3) the other party did in fact rely on the misrepresentation or omission to its detriment. Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981) (citation omitted).
In order to establish a cause of action for consumer fraud in the context of the facts of this case, plaintiffs would have to establish that Mass Mutual concealed, suppressed, or omitted a material fact, knowingly and with intent that others rely on the omission. Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 377, 371 A.2d 13 (1977). In that respect, the consumer fraud action and the first two elements of common law fraud are identical. Further, the actions are similar in that common law fraud requires proof of damages by way of "detriment," while a consumer fraud plaintiff must prove an " `ascertainable loss of moneys or property, real or personal.' " Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473, 541 A.2d 1063 (1988) (quoting N.J.S.A. 56:8-19). The causes of *814 action differ, however, in that common law fraud requires proof of reliance while consumer fraud requires only proof of a causal nexus between the concealment of the material fact and the loss. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 607-608, 691 A.2d 350 (1997) (holding that reliance is not required in suits under the Consumer Fraud Act because liability results from "misrepresentations whether `any person has in fact been misled, deceived or damaged thereby' ")(quoting N.J.S.A. 56:8-2).
The motion judge found a lack of predominance, finding that individualized consideration of each policyholder's interaction with the agent who sold the policy would be required. The judge reasoned:
[E]ach plaintiff may have had a different interaction with the defendant's agents and brokers and the ability to establish reliance on a common law fraud and causation and an ascertainable loss under the Consumer Frauds [sic] Act which would vary from each plaintiff. Therefore, the determination of whether and which illustrations were dispensed to [MassMutual] class members and the nature or differing oral representations made required individualized fact development.
And the Court would basically have to conduct mini trials for each plaintiff. The problems with potential mini trials can even be demonstrated by the lead plaintiff's [case]. Mr. Varacallo stated he solely relied on the charts uponthat were sold to him by agent Braud [sic]. However, numerous other factors may have induced this purchase. These factors include prior oral representations made by the prior agent Mr. Schnipper, possible oral representations made by agent Braud [sic][,] which plaintiff could not recall, and any information [that] his wife may have heard.
If the Court had to perform an inquiry such as this to every plaintiff, the action would be totally unmanageable.
We recognize that the majority of jurisdictions addressing the issue of class certification in vanishing premium litigation have rejected certification on the predominance question. See, e.g., Banks v. New York Life Ins. Co., 737 So.2d 1275 (La. 1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000); Cohn v. Massachusetts Mut. Life Ins. Co., 189 F.R.D. 209 (D.Conn.1999); Parkhill v. Minnesota Mut. Life Ins. Co., 188 F.R.D. 332 (D.Minn.1999); Russo v. Massachusetts Mut. Life Ins. Co., 178 Misc.2d 772, 680 N.Y.S.2d 916 (N.Y.Sup.Ct.1998); In re Jackson Nat'l Life Ins. Co., Premium Litig., 183 F.R.D. 217 (W.D.Mich.1998). Rather than counting cases for or against class certification, however, it is more appropriate to identify and apply principles established in this State on the issue. As our Supreme Court pointed out long ago, "different courts, even when presented with substantially similar, if not identical, claims have reached divergent conclusions in deciding whether to certify a class action." In re Cadillac, supra, 93 N.J. at 431, 461 A.2d 736.
For nearly thirty years, our highest court has instructed trial courts to liberally allow class actions involving allegations of consumer fraud. Riley, supra, 61 N.J. at 228, 294 A.2d 7. That principle has been reiterated and reinforced over the years even where the claim involved theories of common law fraud as well as consumer fraud. Strawn v. Canuso, 140 N.J. 43, 49, 68, 657 A.2d 420 (1995); In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736. Irrespective of whether the trial court may be required to deal with individual claims of reliance, causation, and/or damages, the predominance factor has been met and class actions have been approved in this State where the court has found a common core of operative facts and the plaintiffs are seeking "to redress a `common legal grievance.' " In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736 (upholding class certification of 7,500 consumers, where General Motors claimed that there would have to be individual trials on issues pertaining to causation and damages); *815 see also Strawn, supra, 140 N.J. at 67, 657 A.2d 420 (reversing the trial court's denial of class certification in a consumer fraud case on the predominance issue "[d]espite potential issues of causation, reliance, and damages particular to the individual actions").
Despite the complexity of management that cases such as In re Cadillac and Strawn have posed for trial courts, we perceive from the pronouncements of our Supreme Court that there is an overarching principle of equity to consider in the application of the class certification rule. The principle is that class actions should be liberally allowed where consumers are attempting to redress a common grievance under circumstances that would make individual actions uneconomical to pursue. See In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736 (consequence of class certification is that it equalizes "the ability of the parties to prepare and pay for the advocacy of their rights"). Should the representative plaintiff succeed in this case on liability, the relatively small amount of damages incurred by each of the policyholders and the shared common grievance based upon the withholding of material facts brings this case within that equitable principle. The additional benefits of such litigation is that it promotes "efficient judicial administration, ... save[s] time and money for the parties and the public[,] and [] promote[s] consistent decisions for people with similar claims." Id. at 430, 461 A.2d 736. We are aware that class actions can be used for the wrong reasons as well. "One potential abuse ... is that attorneys may solicit claims more to generate fees for themselves than to vindicate the rights of claimants." Id. at 424, 461 A.2d 736 (citation omitted). We have, however, seen no indication of that in this case. Indeed, the record reveals that plaintiffs have survived one summary judgment motion on the legal theories upon which liability is premised.[3]
In any class action determination, there must be a careful analysis of the plaintiff's claim to determine whether the defendant's argument against certification is realistic. The analysis from such perspective is necessary because, just as a court must understand the unworthy motive that may prompt an attorney to seek class certification, the court must also understand why a defendant would resist it. And so, it should be readily appreciated that, regardless of the merits of the underlying theory of liability, a defendant may be willing to withstand a small verdict against it and make subsequent adjustments with respect to other claims, whereas a judgment against it that includes many small, but trebled claims, as well as attorney fees, can be costly in money and reputation. Thus, it is unlikely that a court will encounter a defendant who embraces a plaintiff's effort to obtain class certification.
Mass Mutual's argument against certification on the predominance issue is that individualized "mini trials" will have to take place as to each policyholder. The argument necessarily presupposes a finding of liability against Mass Mutual on the first two elements of either common law fraud, consumer fraud, or both. Consequently, for the purpose of discussion, we also have assumed that Mass Mutual knowingly omitted from its printed literature, and withheld from its agents, material information concerning the financial condition of the company as it was then known to exist. That is, while the literature represented that dividends "may" go down depending on market forces over which Mass Mutual could exert no control, there was in truth, a substantial probability that they would go down. We further assume that Mass Mutual withheld the *816 information knowing that consumers probably would not purchase its vanishing premium policy over that of its competitors if the consumer knew with certainty that the projections based on current dividends would not hold.
It is important to reiterate here that plaintiffs contend the agents of Mass Mutual had no knowledge as to these material facts. Thus, no member of the class will claim that the agents told them more than what was represented in the literature. It may well be, as Mass Mutual contends, that sales presentations differed from agent to agent depending on their individual skills, and from client to client depending on their needs and ability to comprehend. But we find no evidence in the record that these agents made sales pitches that went beyond the literature produced by Mass Mutual, or that any of them knew Mass Mutual could not support the projected dividends and intended to ratchet them down as a certainty, but failed to tell prospective policyholders. Even if some or many of the policyholders relied upon the agents' sales pitch, we have held that the reliance element in a common law fraud claim may be satisfied by proof of indirect reliance where a party deliberately makes "false representations... with the intent that they be communicated to others for the purpose of inducing the others to rely upon them." Metric Investment, Inc. v. Patterson, 101 N.J.Super. 301, 306, 244 A.2d 311 (App.Div.1968); see also Judson v. Peoples Bank & Trust Co., 25 N.J. 17, 134 A.2d 761 (1957)(holding that defendant's conduct may support a claim in common law fraud even though defendant did not make the misrepresentations directly, but communicated false statements to another and urged that person to communicate the falsehoods to third-parties with the intent that the thirdparties rely on the misrepresentations). More recently, we have held that a purchaser of corporate securities "may maintain an action for common law fraud even though the purchaser was not aware of ... [the] false statements issued by the corporation." Kaufman v. I-Stat Corp., 324 N.J.Super. 344, 346, 735 A.2d 606 (App. Div.), certif. granted, 162 N.J. 489, 744 A.2d 1211 (1999). Applying the concept of indirect reliance and theory of fraud on the market, we concluded that the purchaser could rely "upon the integrity of the market price for a corporate security which has been artificially inflated by the corporation's deliberate false statements." Id. at 348, 735 A.2d 606; see also Cope v. Metropolitan Life Ins. Co., 82 Ohio St.3d 426, 696 N.E.2d 1001, 1008-1009 (1998) (permitting class action where plaintiff's claims were not based on agents' oral or affirmative misrepresentations but, rather, on allegations that defendant intentionally omitted material facts); Security Life of Denver Ins. Co. v. Ferguson, No. 05-98-01738-CV, 1999 WL 339017 (Tex.App. May 28, 1999)(to the same effect); compare Keyes v. Guardian Life Ins. Co. of Am., 194 F.R.D. 253 (S.D.Miss.2000)(denying class certification in a vanishing premium case, but distinguishing Cope, and therefore this case, on the ground that Keyes did not allege that defendant concealed the true facts from the agents).
It is inconceivable to us, considering the assumption that Mass Mutual's liability is premised on a knowing omission of material information, that discovery will reveal more than a very small number of policyholders who would have purchased an N-Pay Policy, rather than a competitor's policy, if the Mass Mutual literature stated that the illustrated dividends "probably will," rather than "may," decrease and that the payout period "probably will," rather than "may," be longer than projected. Plaintiffs are required to prove only that defendant's conduct was a cause of damages. They need not prove that Mass Mutual's conduct was the sole cause of loss. See Gennari, supra, 148 N.J. at 608, 691 A.2d 350 (builder's misrepresentations as to their qualifications, as well as realtor's misrepresentations, proximately caused purchasers' damages). It may be *817 that some extraordinary sales agent could overcome such negative information thereby becoming the superceding cause of a policyholder's loss, but we think it a small possibility.
Indeed, if liability is found upon a violation of our Consumer Fraud Act, we reiterate that the Act requires only a causal nexus between the "method, act, or practice declared unlawful" and the consumer's "ascertainable loss." N.J.S.A. 56:8-19. The Supreme Court has taken pains to point out that this element is a significant distinction from the requirement of reliance in a common law fraud claim. A defendant who violates the Act because of an unlawful "method, act, or practice" that results from an omission of a material fact with the "intent that others rely upon such concealment, suppression or omission," N.J.S.A. 56:8-2, is "liable for [such] misrepresentations whether `any person has in fact been misled, deceived or damaged thereby.' " Gennari, supra, 148 N.J. at 607-608, 691 A.2d 350 (quoting N.J.S.A. 56:8-2). The distinction between proof of reliance and proof of causation can be best explained in the context of this case. If plaintiffs succeed in proving that Mass Mutual withheld material information with the intent that consumers would rely on it in purchasing Mass Mutual's policy, the purchase of the policy by a person who was shown the literature would be sufficient to establish prima facie proof of causation.
Where the theory of recovery is common law fraud, in which reliance is required, our analysis of the predominance issue requires resolution of this question: For purposes of certifying a class, must the plaintiffs offer direct proof that the entire class relied on defendant's representation that omitted material facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued? We think not.
The United States Supreme Court has held that plaintiffs alleging securities fraud in violation of federal law "involving primarily a failure to disclose," do not have to provide "positive proof of reliance" in order to recover. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741, 761 (1972). All that is required is that the information "withheld be material in the sense that a reasonable investor might have considered them important in the making of [the] decision." Id. at 153-54, 92 S.Ct. at 1472, 31 L.Ed.2d at 761 (citations omitted). Further, the "obligation to disclose and [the] withholding of a material fact establish the requisite element of causation in fact." Id. at 154, 92 S.Ct. at 1472, 31 L.Ed.2d at 761-62 (citation omitted). As a practical matter, the burden then shifts to the defendant to prove "that even if the information were disclosed[,] the [plaintiff] would not have acted differently." Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1520 (10th Cir.1983).
The presumption or inference of reliance and causation, where omissions of material fact are common to the class, has been extended in the context of both common law and statutory fraud. See Murray v. Sevier, 156 F.R.D. 235, 248-49 n. 11 (D.Kan.1994)(it is proper to presume reliance where the omission of material fact is common to the class); Adams v. Little Missouri Minerals Ass'n, 143 N.W.2d 659, 684-85 (N.D.1966)(inference of reliance is necessary where material facts are suppressed). The Supreme Court of California has broadened this concept to include all material misrepresentations, whether facts are not disclosed or falsely represented. In Vasquez v. Superior Court of San Joaquin County, the Court held that "an inference of reliance would arise as to the entire class ... if the trial court finds material misrepresentations were made to the class members." 4 Cal.3d 800, 94 Cal. Rptr. 796, 484 P.2d 964, 973 (1971); see also Wilner v. Sunset Life Ins. Co., 78 Cal.App.4th 952, 79 Cal.App.4th 719F, 93 Cal.Rptr.2d 413, 420 (2000)(applying Vasquez doctrine in a class action, wherein *818 class members alleged "churning" by an insurance company). Of course, the inference may be rebutted, but it is the burden of the defendant to come forward with sufficient evidence to do so. Vasquez, supra, 94 Cal.Rptr. 796, 484 P.2d at 973. In coming to this result, the Court relied upon universally recognized principles of law. Id. at 972-73 (citing 12 Williston on Contracts § 1515 (3d ed.1970) (where action is taken in response to material representations, "in the absence of evidence showing the contrary, it will be presumed that the representations were relied on"); Restatement of Contracts § 479, illus. 1). More recently, the Ohio Supreme Court held that direct proof of reliance is not necessary and may be presumed or inferred where "there is nondisclosure of a material fact." Cope, supra, 696 N.E.2d at 1008.[4] Where the omission of fact is common to the entire class, class certification is favored. Ibid.
The concept of burden shifting where logic and fairness dictate that result is not foreign to our State's jurisprudence. In a different context, our Supreme Court has recognized the artificiality of placing the burden on a plaintiff to prove a negative in order to establish an element of the cause of action. See Carter-Wallace Inc. v. Admiral Ins. Co., 154 N.J. 312, 330-31, 712 A.2d 1116 (1998)(holding in an environmental coverage case, that placing the burden of proving the insured intended or expected environmental damage from its conduct on the insurer is fairer than requiring the insured to prove that it did not intend or expect it); Coffman v. Keene Corp., 133 N.J. 581, 600, 628 A.2d 710 (1993) (holding that there is a presumption that a consumer would have obeyed a warning had one been given by the manufacturer, rather than require the consumer to prove that they would not have acted as they did had a proper warning been given). Accordingly, we hold that if the plaintiffs in this case establish the core issue of liability, they will be entitled to a presumption of reliance and/or causation. The presumption shall be governed by the operation of N.J.R.E. 301. See, e.g., Sharpe v. Bestop Inc., 314 N.J.Super. 54, 713 A.2d 1079 (App.Div.1998), aff'd, 158 N.J. 329, 730 A.2d 285 (1999). We expect that the resolution of this issue will have significant bearing on the management of this matter with respect to the number of separate trials that may have to be conducted.
Finally, we address briefly the issue of superiority. As the Court in Strawn observed, class actions are generally considered the superior form of disposing of cases involving claims of consumer fraud. Strawn, supra, 140 N.J. at 68, 657 A.2d 420. This is especially so where, as here, there is a common nucleus of law and fact that will decide an essential element of liability, and the amount of money at stake for each potential member of the class is too small to warrant prosecution of separated actions. In re Cadillac, supra, 93 N.J. at 435, 461 A.2d 736; Delgozzo, supra, 266 N.J.Super. at 193, 628 A.2d 1080. Thus, we reject Mass Mutual's claim that individual law suits are superior in the context of this type of claim. We also reject Mass Mutual's suggestion that *819 individual complaints could be filed and disposed of by Mass Mutual's Customer Service Department or by the New Jersey Department of Banking and Insurance.
Accordingly, we reverse the judgment under review and remand the matter to the Law Division for the purpose of entering an appropriate order certifying the class as defined in this opinion. In doing so, we do not intend to strip the trial court of its discretion to create subclasses should the need develop, or to de-certify the class in the future should the litigation become unmanageable for reasons that we have not anticipated.
NOTES
[1] This number defines the maximum possible number of claimants in the class.
[2] Pursuant to N.J.A.C. 11:2-23.5(e)2:

An advertisement shall not state or imply that the payment or amount of dividends is guaranteed. If dividends are illustrated, they must be based on the insurer's current dividend scale and the illustration must contain a statement to the effect that they are not to be construed as guarantees or estimates of dividends to be paid in the future[.]
The regulation, however, cannot be interpreted to define the outer limits of an insurer's obligation to disclose material facts in the sale of its policies to consumers.
[3] We hasten to note that the motion was at the very beginning of the case. Our observation is not intended to preclude further motions when discovery on liability is completed. Nor are our remarks intended to reflect our views on the ultimate merits of plaintiffs' legal theories of liability.
[4] Cope cites a Sixth Circuit case that illustrates why it would be proper to infer reliance in Varacallo's case. In Michaels Bldg. Co. v. Ameritrust Co., N.A., the court addressed the argument of one defendant that "reliance is an essential element of a claim of fraud" and that plaintiffs had not relied upon the false representation of the bank's prime rate. 848 F.2d 674, 679 n. 8 (6th Cir.1988). The court accepted plaintiff's claim that "it relied upon the proper calculation of that payoff balance as being based upon the established `prime rate.' " Ibid. In resolving the defendant's argument, the court reasoned that it was appropriate to infer that the alleged misstatement of the true prime rate "influenced plaintiffs' decision to borrow money from those defendant banks." Ibid. Similarly, it is proper here to infer that Mass Mutual's representation that dividend changes "may" occur influenced the class members' decision to purchase the policy and that decision may have been different had Mass Mutual disclosed the fact that it knew to a near certainty that rates would decline.