*350 OPINION OF THE COURT
Walter J. Relihan, Jr., J.
The plaintiff moves again for class certification in this “vanishing premium” case. Plaintiffs earlier motion (Nov. 1998) was denied on the assumption, in part, that section 349 of the General Business Law simply restated the common law of fraudulent inducement which requires not only reliance upon a false or misleading representation, but also that the reliance was reasonable under the circumstances (Russo v Massachusetts Mut. Ins. Co., 178 Misc 2d 772). However, in December 1999 the Court of Appeals made plain that section 349 created a new and expanded consumer cause of action which does not require the plaintiff to prove the reasonableness of her reliance, but only that defendant engaged in an act or practice that is deceptive in a material way and that the act or practice has caused an injury to plaintiff (Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330 [now popularly known as Gaidon I]).
Meantime, the Appellate Division affirmed Russo on statute of limitations grounds (274 AD2d 878). Then, in May 2001, the Court of Appeals revisited Gaidon to hold that the statute of limitations, in a section 349 case, begins to run not when the policy was issued, as the Appellate Division had held in Russo, but only when the insured is billed for an additional premium beyond the date (i.e., the “N” date in policy parlance) which the insurer had represented would end the insured’s obligation to pay further premiums (Gaidon v Guardian Life Ins. Co. of Am., 96 NY2d 201 [hereafter Gaidon II]). Hence, the Russo claim is timely and was remanded to this court for further proceedings.
It is still necessary to show that the representation was deceptive in the sense that it would be “likely to mislead a reasonable consumer acting reasonably under the circumstances” (Gaidon I, supra at 344; Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 26). The close but distinct relationship between reasonable reliance upon the representation by the plaintiff, as required at common law, and the causation required by the General Business Law claim, is explicated in Stutman v Chemical Bank (95 NY2d 24).
Gaidon I held that disclaimers found in policy illustrations used to explain the limited pay or vanishing premium concept are not determinative of claims brought under section 349, since the statute deals with deceptive business practices, not *351 merely deceptive contracts. Moreover, the court held that the disclaimers used by the insurer in that case, while sufficient to defeat a fraud cause of action, did not include an explanation of (at 345) “the true, unrevealed relationship between dividend/ interest rates and the vanishing dates as represented.” That is, the disclaimers “revealed the possibility of a dividend/interest rate decline, but did not reveal its practical implications to the policyholder. Although they did not guarantee that interest rates would remain constant, they failed to reveal that the illustrated vanishing dates were wholly unrealistic” (Gaidon I, supra at 350). Partial disclosures, where other undisclosed facts would materially alter the expectations implicit in such disclosures, are sufficient to constitute an actionable misrepresentation under the General Business Law.
The argument that defendant knowingly overstated interest rates, and knew that revenues would not be adequate to dispense with the need for premiums beyond the “N-Pay” date, goes to the ultimate merits of the Russo claim, as well as the class claims. The issue on this motion for class certification, however, is not whether one or more of the defendant’s illustrations were deceptive, or whether defendant knew or should have known of the illusory nature of the representations, but whether the Russo candidacy for class representative meets and satisfies the requirements of article 9 of the Civil Practice Law and Rules. Section 901 (a) (2) requires that issues of fact or law, common to the members of the class, must predominate over issues affecting only individual members. Section 901 (a) (3) requires that the claim of the class representative must be typical of those to be asserted by other class members. If Russo’s transaction was not typical of those consummated by other members of the class and, consequently, does not involve questions of fact common to the claims of the class members she seeks to represent, the purposes of class action litigation will not be served.
Plaintiff has established that a question of fact is present as to whether defendant knowingly assumed unrealistically high investment returns in order to market “N-Pay” policies on the representation that, after a fixed number of premiums are paid, the necessity to pay further premiums would vanish. However, it is not the gestation and hatching of a deceptive plan or practice by the home office that triggers a violation of section 349, but the making of a representation to a consumer which is deceptive in a material way and likely to mislead an objectively reasonable consumer (Goshen v Mutual Life Ins. Co. of N.Y., 98 *352 NY2d 314). Accordingly, the encounter between defendant’s sales agent and plaintiff, as a buyer of the N-Pay policy, is the essential focus of her General Business Law claim.
The plaintiff is a college graduate and has been a support services supervisor at Rogers & Wells and a vice-president of a recruiting firm. She is not unacquainted with contracts and other business dealings. When leaving her job with the law firm, plaintiff met with a sales representative of defendant with a view to converting her Rogers & Wells group life policy to an individual whole life policy. The meeting between Russo and defendant’s agent, Susan Weiner, occurred on May 2, 1989. Weiner showed Russo some illustrations of the N-Pay policy concept which disclosed that dividend rates were not guaranteed and that premiums, in addition to those illustrated, could become necessary. Russo asserts that Weiner made no mention of declining interest rates or the likely effect of such trends. Weiner, when deposed, had no recollection of the conversation but claimed that she would routinely advise clients that future dividends were not guaranteed and that the number of premium payments could change.
The plaintiff’s own deposition testimony demonstrates that she relied substantially upon the oral presentation of Weiner regarding the terms and conditions of the policy in relation to her wants and needs and not the written illustrations. Russo testified (deposition, at 68): “All I can say is that I took what Ms. Weiner told me at face value and never really thought about dividends or interest rates or whatever.” Referring to the written policy illustrations, she stated: “I didn’t really pay too much attention to footnotes and this language.” Elsewhere Russo testified that she could not recall reading the language of the illustration presented to her by Weiner (deposition, at 38) or, alternatively, that she may have “browsed through it” but that she didn’t “analyze it” (deposition, at 32, 36-38).
Plaintiff argues, nevertheless, that Weiner’s oral presentation was based upon home office illustrations and other written materials which uniformly omitted any cautionary revelations about the decline in interest rates, which began sometime in late 1985 or 1986 and continued thereafter, rendering earlier assumptions increasingly doubtful. However, there is documentary evidence (Guarrera affidavit and exhibits) that defendant issued periodic admonitions to its general agents, for the instruction of sales personnel, that “The N-Pay Strategy” involved not only limited payment advantages but also unique risks.
*353 An October 1988 advisory, issued before the Russo sale, warned that “Illustrations should be used to keep clients up to date on the effect any changes in the dividend scale will have on their out-of-pocket outlays either now or in the future.” The document recommended “frequent reviews” of N-Pay policies with insureds and that such reviews are “never more important than during the period directly following a reduction in dividends” (exhibit A). Another of the periodic advisories, issued to agents between 1990 and 1995, noted that: “If the dividend scale changes, the policy may N-Pay earlier, later, or N-Pay as scheduled and a short time later require the resumption of out-of-pocket premiums” (Guarrera exhibit I).
Concededly, these cautionary messages, several of which were issued during the proposed class period, do not warn that investment returns had declined to a point that made earlier projections unreliable. Nevertheless, the periodic circulars are sufficient to warn that “Dividends are not guaranteed and can fluctuate significantly” (Guarrera exhibit F of Dec. 1990), that N-Pay policies should be sold only if the insured is “willing to accept the additional risk of funding [the] policy through future dividends which are not guaranteed” and are advised that: “It is important to remember * * * there is the possibility out-of-pocket payments may be required sometime in the future if dividends change” (Guarrera exhibit I).
Given this stream of advisories, we cannot know what materials from the home office any given agent might have consulted and used in the course of discussions with clients during the proposed class period. Absent an individual inquiry into each oral presentation, a jury could not know whether the description of the risks surrounding the N-Pay plan were misrepresented by an agent and whether an objectively reasonable insured would have been misled by an oral presentation which, at minimum, may have used the most cautionary of the home office materials to emphasize those risks and may have used even stronger depictions of the possible risks.
The November 1998 opinion of this court is still relevant in part: “The fundamental difficulty in the plaintiffs class certification motion lies in the fact that the illustrations, and only the illustrations, tie the class together. However, the sale of defendant’s insurance products is typically consummated by agents and brokers using a variety of methods which may or may not include home office materials. During the class period, defendant sold its insurances through some 35,000 representatives. About 900,000 whole life policies were *354 purchased. The text of the illustrations changed several times during the period. As interest rates fell, each version became more explicit regarding the nonguaranteed nature of the dividends and each more clearly reiterated the possibility that additional premiums might become necessary. Countless combinations and permutations of financial and personal factors may have induced each of the individual sales, whether or not an illustration was mentioned or displayed by the agent, or ‘browsed’ by the insured. These transactions, counsel advise the court, could number in the tens of thousands.” (Russo, supra at 774-775.) A sentence dealing with the reliance factor is here deleted. The opinion continues: “Russo is the proposed class representative. However, as we have seen, the illustrations played a minor role, and perhaps no role, in her decision to buy. By contrast, the class claim rests upon the contention that the members were seduced and victimized by the false and misleading illustrations which Russo, for the most part, ignored. Hence, her claim is not typical of the class she purports to represent, as required by CPLR 901 (a) (2) (Vermeer Owners v Guterman, 169 AD2d 442, 445, affd 78 NY2d 1114). If we assume that the Russo transaction is typical, the causal connection between any given illustration and any particular sale to a class member would be open to the same serious questions as surround the Russo sale. If the Russo sale is not typical, we can only guess at the role an illustration may have played in other sales. On either hypothesis, a mini-trial would become necessary to determine whether an illustration was shown to the insured, which illustration was shown, whether the illustration was noticed and considered by the insured * * * ” (id. at 775).
The class action mechanism is useful only in the presence of common issues which, once resolved, will expedite a just result in a host of similar cases, many of which could not be prosecuted economically on their own. Here, we cannot assume, without an evidentiary hearing, that sales to the class were triggered by the same sales presentation (Small v Lorillard Tobacco Co., 94 NY2d 43; Karlin v IVF Am., 239 AD2d 562; Norwalk v Manufacturers & Traders Trust Co., 80 AD2d 745; Ross v Amrep Corp., 57 AD2d 99, 103, appeal dismissed 42 NY2d 910). The oral statements attributed to Weiner by Russo, however misleading, cannot serve as surrogate for the statements by other agents to countless other members of the putative class. Whatever the exact words used by Weiner, it cannot be shown that plaintiff acted on the basis of a uniform misrep *355 resentation which caused others to suffer a similar financial loss. Inquiries into each oral sales presentation would defeat the economy of effort envisioned by the class action mechanism. The common element, which arguably unites the class, is anything but common.
Plaintiff invites our attention to Varacallo v Massachusetts Mut. Life Ins. Co. (332 NJ Super 31, 752 A2d 807), in which the Appellate Division of the New Jersey Superior Court reversed the trial court and certified a class action against the defendant in a similar vanishing premium case. The plaintiff’s reliance is misplaced. Unlike the case at bar, Varacallo relied upon the printed illustrations provided by the insurer, not the agent’s oral presentation. “[Varacallo] explained that [the agent] showed him the chart, but * * * anything [the agent] said ‘didn’t register’ to him because ‘[the agent] meant nothing to me.’ He explained that he had purchased four other policies and his decision to purchase the 1989 policy was ‘based on the information that [Mass Mutual] gave [him] on’ the sales illustration” (Varacallo, supra, 332 NJ Super at 39-40, 752 A2d at 811). Only one other appellate court, to the present, has affirmed a class action certification motion against defendant on facts similar to those at bar. Massachusetts Mut. Life Ins. Co. v Superior Ct. (97 Cal App 4th 1282, 119 Cal Rptr 2d 190) involved the “unique scope” of California’s Unfair Competition Law. The relevance of this decision to the very different elements of the New York statute is dubious in the extreme.
Russo argues that Weiner’s oral remarks were not and could not have been invented by Weiner and must have been based upon home office materials, distributed to the sales force, which were based on knowingly false assumptions about the defendant’s investment revenues from cash value policies. The point is powerful but cannot be proven except by evidence that each member of the class was treated to a similar oral presentation. The content of the individual oral presentation might have reflected the candor of some of the later home office materials or the incomplete information contained in earlier advisories, or the agent’s own assessment of the N-Pay concept. The substance of the words used to explain the limited pay concept to plaintiff, and others in the putative class, is not a subsidiary matter which can be left to later subproceedings. It is a central issue in the context of class certification.
A different class representative, Varacallo or someone like him, might have been found who was presented with, and acted upon, the same written materials and, hence, the same *356 representations. In that circumstance, a jury could examine the representation, determine whether it was deceptive in the sense that an objectively reasonable consumer would be likely to have been misled, and award a class wide remedy. Even the assessment of damages, while a lesser consideration, is not free of difficulty and would require individual assessment. Russo cannot satisfy the requirements of CPLR 901 (a) (2) and (3) and the motion must be denied.