925 A.2d 684 (2007)
394 N.J. Super. 98
Alan BEEGAL and Bonnie Beegal, Kenneth Sataloff and Sheila Sataloff, Lawrence Benton and Carol Benton, Michael Block and Abbe Block, Robert Waxler, Esquire and Stella Rosner, individually and on behalf of all similarly situated individuals, Plaintiffs-Respondents,
v.
PARK WEST GALLERY, Park West at Sea, Defendants-Appellants, and
Carnival Cruise Lines[1], Defendant.
Superior Court of New Jersey, Appellate Division.
Argued March 21, 2007.
Decided June 22, 2007.
*688 Douglas S. Eakeley, Roseland, argued the cause for appellants (Lowenstein Sandler, attorneys; Mr. Eakeley, of counsel; Gavin J. Rooney, Melissa Toner Lozner and Mr. Eakeley, on the brief).
Kenneth G. Andres, Haddonfield, argued the cause for respondents (Begelman & Orlow, Andres & Berger, and Garber & Nathan, attorneys; Ross Begelman, on the brief).
Before Judges CUFF, WINKELSTEIN and FUENTES.
The opinion of the court was delivered by
*689 WINKELSTEIN, J.A.D.
On leave granted, defendants challenge the Law Division's certification of a putative class of plaintiffs composed of bidders at art auctions conducted on cruise ships. Plaintiffs claim defendants inflated the prices of the art through fraudulent bidding practices. We conclude that because the difficulties likely to be encountered in the management of this class action cannot be overcome, see R. 4:32-1(b)(3)(D), common questions of law do not predominate over individual questions. Consequently, we conclude that class certification was improvidently granted.

I.
Defendants, Park West at Sea, a Delaware corporation with its principal place of business in Florida, and Park West Gallery, a Michigan corporation with its principal place of business in Michigan (collectively, defendants or Park West), conduct land-based art auctions and art auctions aboard cruise ships. They maintain art storage facilities in both Florida and Michigan. Plaintiffs are New Jersey residents who represent the putative class, which includes potentially thousands of residents of the United States[2] who, between 1996 and the present, attended those auctions.
Since 1996, Park West has conducted auctions on ships operated by seven different cruise lines, departing from a variety of locations, including numerous states and territories, as well as international ports. Plaintiffs estimate that 90,000 individuals bid on art on Carnival Cruise Lines alone. While the parties agree that the auctions were held on board the cruise ships, the record is not specific as to where the ships were located when the auctions took place.
Defendants also sold art at sidewalk sales and in on-ship galleries. While they maintain records of the names and addresses of the individuals who purchased art, the records do not indicate the means by which the art was purchased, nor do they contain the names of individuals who attended auctions without making a purchase.
As is standard practice in the auction industry, art sold at defendants' auctions was subject to a "reserve," a confidential minimum price below which the art would not be sold. Park West's customer catalog states that "[w]e may implement such reserve by opening or continuing the bidding, or [by] placing bids in response to other bidders, up to the amount of the reserve."
While the auctioneers are independent contractors, Park West supplies them with a "Policy and Procedure Manual." The manual provides for eight levels of pricing for any given work. In order of highest to lowest, they are: "Above Reserve"; "Reserve"; "Below Reserve"; "Redline"; "Under"; ".9 Under"; ".8 Under"; and "Below." When conducting an auction, the auctioneer views a computer screen that lists, for each piece of art, the prices corresponding to those various pricing levels. According to the manual, an auctioneer has the discretion to set the reserve anywhere in the range from the price representing the "below" pricing level to the price representing the "reserve" pricing level. The manual states that the "below" is the price below which the art may not be sold. Most auctioneers, guided by the range established by the pricing levels, mentally set a reserve, "[o]n the fly"; it is not a pre-determined amount. Accordingly, that number is never written down or *690 disclosed, and is subject to change at the auctioneer's discretion.
The auctioneer may also place bids on behalf of the house (house bid). The only limit in placing house bids is the "reserve" pricing level on the auctioneer's computer. The auctioneer may bid a sum higher than the reserve, which is referred to as "bidding to reserve" and serves to "stimulate bidding."
Plaintiffs allege that under these practices, the "below" pricing level represents the true reserve and the house bidding procedure fraudulently inflates the value of the art. They further assert that not only do auctioneers artificially inflate bids, but they place house bids in a deceptive manner. For example, the auctioneer will sometimes bid to reserve by using a "house number," a number not assigned to the placard of any bidder in the room. If an auctioneer places a house bid using a house number, and no one places a higher bid, the auctioneer will end the auction and call out the house number, so that the audience believes the art has been sold for that price. Plaintiffs allege that auctioneers do not always disclose that the house places the bid; they sometimes point to the back of the gallery to lead the audience to believe that an audience member placed the bid.
Park West's materials instruct auctioneers to use the bid-to-reserve technique to maximize sales. Nevertheless, the instructions direct auctioneers to be honest with bidders; not to pretend to acknowledge a non-existent bidder; and not to indicate that a work has been sold if it has not. At their depositions, many auctioneers testified that they infrequently use the bid-to-reserve procedure, and they never do so where a customer has already placed a bid or where a piece of art is unique.

II.
The trial court's order granted class certification to "`[a]ll individuals who attended and bid on artwork and were at any of the Park West live auctions from 1996 to present[,]' [w]ith respect to the following cause of action: `Any claims premised on an alleged violation of the New Jersey Consumer Fraud Act.'"[3] In New Jersey, class certification is governed by Rule 4:32-1, which is modeled after the federal class action rule, Fed.R.Civ.P. 23. Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 103, 922 A.2d 710 (2007); Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 41, 752 A.2d 807 (App.Div.2000); see also Muise v. GPU, Inc., 371 N.J.Super. 13, 31, 851 A.2d 799 (App.Div.2004) (Muise II) ("Construction of the federal rule may be considered helpful, if not persuasive, authority."). To attain class certification, a plaintiff must establish the following four requirements:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
[R. 4:32-1(a); see also Muise II, supra, 371 N.J.Super. at 30, 851 A.2d 799 (referring to the "threshold requirements" of numerosity, commonality, typicality and adequacy of representation).]
A plaintiff must not only satisfy the prerequisites of paragraph (a) of Rule *691 4:32-1, but must also establish one of the three factors articulated in paragraph (b) of that rule. As is relevant to this case, Rule 4:32-1(b) requires that:
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include:
(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(C) the desirability or undesirability in concentrating the litigation of the claims in the particular forum; and
(D) the difficulties likely to be encountered in the management of a class action.
[R. 4:32-1(b)(3).]
The party seeking class certification bears the burden of establishing that the requirements of Rule 4:32-1 are met. Iliadis, supra, 191 N.J. at 106, 922 A.2d 710; Muise II, supra, 371 N.J.Super. at 32, 851 A.2d 799.
The class action is "`an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only,'" Iliadis, supra, 191 N.J. at 103, 922 A.2d 710 (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176, 193 (1979)), and is an "`invention of equity'" that "enable[s] litigation to proceed `in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable.'" Id. at 103, 922 A.2d 710 (quoting Hansberry v. Lee, 311 U.S. 32, 41, 61 S.Ct. 115, 118, 85 L.Ed. 22, 27 (1940)). It "level[s] the playing field between adversaries," Iliadis v. Wal-Mart Stores, Inc., 387 N.J.Super. 405, 415, 904 A.2d 736 (App. Div.2006), rev'd on other grounds, Iliadis, supra, 191 N.J. 88, 922 A.2d 710 by "equaliz[ing] . . . the ability of the parties to prepare and pay for the advocacy of their rights." In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 435, 461 A.2d 736 (1983); see also Iliadis, supra, 191 N.J. at 104-05, 922 A.2d 710 (discussing equalizing function of class action). Thus, despite the complexity of management a class action poses for a trial court, "overarching principle[s] of equity" dictate that Rule 4:32-1 be liberally construed, especially in consumer fraud actions brought to redress common grievances, under circumstances that would make individual actions uneconomical to pursue. Varacallo, supra, 332 N.J.Super. at 45, 752 A.2d 807; see also Iliadis, supra, 191 N.J. at 103, 922 A.2d 710.
Given these policy considerations, class certification should be granted absent a clear showing that it is inappropriate or improper. Iliadis, supra, 191 N.J. at 103, 922 A.2d 710. A trial court deciding a motion for class certification affords the plaintiffs every favorable view of their complaint and the record. Int'l Union of Operating Eng'rs Local # 68 Welfare Fund v. Merck Co., 384 N.J.Super. 275, 284, 894 A.2d 1136 (App.Div.) (trial court does not analyze likelihood of plaintiffs' success, only whether class action is superior method of adjudication), leave to appeal granted, 188 N.J. 215, 902 A.2d 1232 (2006). Still, the court should undertake a "rigorous analysis" to determine if the requirements of the rule have been met, and must understand the claims, defenses, relevant facts and applicable substantive *692 law necessary to make a meaningful determination. Iliadis, supra, 191 N.J. at 106, 922 A.2d 710.
Class certification decisions rest in the sound discretion of the trial court and an appellate court reviews for abuse of discretion. Muise II, supra, 371 N.J.Super. at 29, 31, 851 A.2d 799. The judge's legal decisions relevant to class certification, however, including his or her choice of what law governs the class, are reviewed de novo. Int'l Union, supra, 384 N.J.Super. at 284, 894 A.2d 1136.
Here, defendants challenge the court's class certification, arguing that common questions of law and fact do not predominate. See R. 4:32-1(b)(3). The "predominance" requirement is analytically distinct from, and more demanding than, the commonality requirement of Rule 4:32-1(a)(2). Iliadis, supra, 387 N.J.Super. at 416-17, 904 A.2d 736. To meet the predominance requirement, it is not necessary that all issues be identical among class members; the issues common to the class must simply outweigh those that are not. Saldana v. City of Camden, 252 N.J.Super. 188, 197, 599 A.2d 582 (App.Div.1991); Debra F. Fink, D.M.D., MS, P.C., v. Ricoh Corp., 365 N.J.Super. 520, 568, 839 A.2d 942 (Law Div.2003) (it is not the number of common issues, but rather their significance, that "sways the pendulum"). Predominance may be found where there is a common nucleus of operative fact, or where the potential class seeks to remedy a common legal grievance. Delgozzo v. Kenny, 266 N.J.Super. 169, 189, 628 A.2d 1080 (App.Div.1993); Saldana, supra, 252 N.J.Super. at 197, 599 A.2d 582.
A consumer fraud class may be certified even where individual questions, such as the degree of damages due a particular class member or reliance by individual class members on a defendant's alleged misrepresentations, remain following resolution of the common issues. Delgozzo, supra, 266 N.J.Super. at 181, 628 A.2d 1080. Nor does the possibility of conflict of laws issues foreclose the certification of a multi-state class; both state and federal courts frequently certify multi-state classes in causes of action based on state law. Id. at 190, 628 A.2d 1080.

III.
Plaintiffs argue that members of the class were injured by defendants' fraudulent scheme either because they paid too much for the art, or because they were unable to purchase art as a result of defendants' fraudulent practices. In their brief in support of their motion in the Law Division seeking class certification, plaintiffs characterized the scheme as follows:
Two related fraudulent practices are engaged in by the auctioneers' as a result of the training they receive directly from Park West. The first practice involves the intentional misuse of the "reserve" and the wrongful placement of bids on behalf of the house. The second involves the use of "fictitious" house numbers designed to mislead auction participants into believing that there is competitive bidding on artwork offered for sale.
Defendants respond that even if plaintiffs could establish a common scheme or general policy to defraud, they cannot prove that the same procedures were utilized in every auction; whether, and to what degree, the alleged practices were used will have to be determined separately for each transaction. Thus, they claim that common issues of fact cannot predominate.
The record before the motion judge included the deposition testimony of auctioneers who testified that, contrary to plaintiffs' allegations, they did not use phantom *693 bidders when placing house bids. In fact, some plaintiffs have admitted they did not personally observe auctioneers using phantom bidders. The record shows that in many auctions, the auctioneer did not place a house bid at all and that many auctioneers would not use the technique if a bid had already been placed by an audience member or if the art was unique. Put simply, the record shows that the procedure followed by auctioneers at each auction varied. A jury may be required to evaluate the circumstances under which each auction was conducted and make individual factual determinations as to each plaintiff. Regardless of the existence of a general fraudulent scheme, whether each particular class member has a claim may be dependent upon the conduct of the particular auction in which the class member participated.
In light of these facts, defendants make a reasonable argument that individual factual issues predominate over common issues so as to preclude the certification of a class. Those plaintiffs who simply bid on art, but did not make a purchase were neither deprived of the full value of a product they purchased for full price, here, the artwork, nor were they induced by misrepresentation into paying more than the product was worth. Said differently, those plaintiffs appear to have sustained no out-of-pocket loss. See Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 240, 251-52, 872 A.2d 783 (2005). Predominance requires that "the fact of damage predominate." See Muise II, supra, 371 N.J.Super. at 46, 851 A.2d 799. Here, the members of the class who did not purchase art at the auctions may have suffered no loss and, as to them, the "fact" of damages may not predominate.
As to those persons who did make purchases at the auctions, plaintiffs offer a letter from an expert, who proposes that damages be calculated by determining the difference between the price paid and the value of the art. Yet, because presumably, each piece of art sold by defendants did not have the same value, the expert's methodology also requires a fact-sensitive, case-by-case analysis. That methodology could also be considered problematic because notably, the essence of an auction is that a bidder does not pay the actual value of the item offered for sale, but instead pays the best price he or she can obtain, which may be more or less than the item's true value. Thus, by its very nature, the price paid for an item purchased at auction is dependent upon, to some degree, other bids offered for the item. Here, then, an accurate damages calculation for each item of art purchased could require, in each individual case, an inquiry into the price paid, what other bids were placed for the item, and what the price would have been had defendants not engaged in fraudulent conduct, if, in fact, defendants committed fraudulent practices at that particular auction.
It is difficult to reconcile these significant factual questions with the requirement of factual predominance that is necessary for a class action. We do not, however, need to address that issue, as we conclude that the litigation requires the application of such divergent governing substantive law, so as to defeat class certification pursuant to Rule 4:32-1(b)(3). See Iliadis, supra, 191 N.J. at 118, 922 A.2d 710 (trial court may deny class certification when the "litigation requires the application of divergent or various governing law," so long as such considerations are "grounded in concrete evidence of actual or likely management problems, not mere speculation of complications that may arise" (citing, inter alia, In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 529 (3d Cir.2004))). Here, under the circumstances, *694 maritime law applies, which makes maritime choice of law principles applicable to the selection of the applicable substantive law. Applying those principles, we conclude that each putative class member's claim is governed by the law of his or her home state, rather than by Florida law, as the trial judge concluded, which will present insurmountable difficulties in the management of the class action.

IV.
In multi-state class actions, variations in state law may swamp common issues and defeat predominance. Fink, supra, 365 N.J.Super. at 568, 839 A.2d 942. Application of one state's law to all claims is rare in a nationwide class action. Int'l Union, supra, 384 N.J.Super. at 303-04, 894 A.2d 1136. When considering a nationwide class, a major concern in the predominance determination is which state's law should apply to each member of the class. Id. at 292, 894 A.2d 1136. The motion court thus has a duty to conduct a choice of law analysis before deciding whether the predominance element is satisfied. Fink, supra, 365 N.J.Super. at 568, 839 A.2d 942. Although conflict of laws issues do not per se foreclose certification of a multistate class, a thorough analysis of state laws is particularly important where a possibility exists that common issues could be subsumed by substantive conflicts in state laws. Id. at 569-70, 839 A.2d 942.
Here, the trial judge rejected admiralty jurisdiction, and determined that New Jersey's choice of law analysis required the application of Florida law. Defendants argue that plaintiffs' claim is subject to admiralty jurisdiction, which ultimately requires the application of the law of the state of each individual claimant's residence. We agree with defendants.
New Jersey courts have concurrent admiralty jurisdiction with the federal courts and apply admiralty law where a two-pronged test is met. Goldson v. Carver Boat Corp., 309 N.J.Super. 384, 390, 392, 707 A.2d 193 (App.Div.1998) (the "saving to suitors" clause of 28 U.S.C.A. § 1333(1) allows claimants to bring admiralty actions in state court); see also Int'l Union of Operating Eng'rs, Local 68 v. Del. River & Bay Auth., 147 N.J. 433, 441, 688 A.2d 569 (absent controversy between two states or express provision in federal statute excluding concurrent jurisdiction, state courts may exercise jurisdiction over cases arising under federal law), cert. denied, 522 U.S. 861, 118 S.Ct. 165, 139 L.Ed.2d 108 (1997). Under the test, admiralty principles apply where: (1) the incident in question occurred in navigable waters; and (2) the alleged wrong bears a significant relationship to "traditional maritime activity." Goldson, supra, 309 N.J.Super. at 390, 707 A.2d 193 (citing Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454, 467 (1972)). These prongs are referred to as the "location test," and the "connection test," respectively. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043, 1048, 130 L.Ed.2d 1024, 1035 (1995).
The location test is met here. While the record is not specific as to the ships' locations at the times the auctions were conducted, it is undisputed that the auctions occurred aboard ship, while the ships were cruising or docked in United States waters, foreign territorial waters, or international waters. Regardless of whether the ships were at sea or in port at the time of the auctions, they were in navigable waters. See Sisson v. Ruby, 497 U.S. 358, 367, 110 S.Ct. 2892, 2898, 111 L.Ed.2d 292, 302 (1990) ("navigable waters" includes being docked at a marina on a navigable *695 waterway). That the planning of the "fraudulent scheme" and the training of the auctioneers may have occurred on land does not negate the undisputed fact that the auctions themselves, which caused the harm to plaintiffs, all took place aboard ship, in "navigable waters." As the United States Supreme Court has observed, in the interest of protecting maritime commerce, "the shore is now an artificial place to draw a line." Norfolk S. Ry. Co. v. James N. Kirby Pty. Ltd., 543 U.S. 14, 25, 125 S.Ct. 385, 394, 160 L.Ed.2d 283, 295 (2004).
The "connection test" raises two separate issues; a court must: (1) assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce, and then (2) determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity. Grubart, Inc., supra, 513 U.S. at 534, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035. The United States Supreme Court has "taken an expansive view of admiralty jurisdiction." Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 901 (11th Cir. 2004), cert. denied, ___ U.S. ___, 126 S.Ct. 548, 163 L.Ed.2d 499 (2005). So long as the incident in question bears some relation to traditional maritime activity and could, in any way, however remote, impact upon the flow of maritime commerce, admiralty jurisdiction is proper. Calhoun v. Yamaha Motor Corp., 216 F.3d 338, 345 (3d Cir.), cert. denied, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).
In applying the connection test, a court looks not only to the specific incident's impact on commerce, but to the potential impact of incidents of that type. Id. at 345 n. 11. To carry out its primary purpose, the protection of maritime commerce, admiralty jurisdiction must extend beyond actual commercial maritime activity, Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674-75, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300, 306 (1982), even beyond the shore line. Norfolk S. Ry. Co., supra, 543 U.S. at 25, 125 S.Ct. at 394, 160 L.Ed.2d at 295.
Ocean-going passenger vessels are engaged in maritime commerce, and where the conduct giving rise to the suit "occur[s] aboard a cruise ship in navigable waters, [the] cause of action contains the traditional nexus for maritime torts." Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 129, 132 (3d Cir.2002) (where child burned the soles of his feet on a hot ship's deck, maritime jurisdiction appropriate); Friedman v. Cunard Line Ltd., 996 F.Supp. 303, 307 (S.D.N.Y.1998) ("maritime nexus . . . is established by the role that ocean-going cruise ships play in maritime commerce"); see also Wallis v. Princess Cruises, Inc., 306 F.3d 827, 831-32, 840-41 (9th Cir.2002) (plaintiff sued for intentional infliction of emotional distress after her husband fell overboard and ship's master told her that her husband had probably been "chopped up" by the propellers and his body would never be recovered); Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 72, 73 (3d Cir.1996) (slip and fall in cruise ship bathtub had nexus to traditional maritime activity).
Maritime commerce may also be affected where the incident giving rise to the suit occurs on land. For instance, both prongs of the "connection test" were met where a ship's staff member committed a sexual assault against a passenger, on land, because the treatment of a ship's passenger has a substantial relationship to commercial maritime activity, and because if passengers are subject to poor treatment, the cruise industry will necessarily suffer. Doe, supra, 394 F.3d at 897-98, 900.
*696 Here, both prongs of the connection test are met. Auctions are commonplace, occur on many cruise ships, and are part and parcel of the cruise ship experience. The "character of the activity"the services and diversions provided for cruise ship passengers while aboard shipshows a "substantial relationship" to "traditional maritime activity." See Id. at 900. The conduct complained of here has a potentially disruptive impact on maritime commerceif cruise ship passengers know they are subject to fraudulent conduct while aboard ship, the cruise ship industry will "necessarily suffer." See ibid. It is thus irrelevant that defendants may have planned the fraudulent scheme or trained the auctioneers on land. See Norfolk S. Ry. Co., supra, 543 U.S. at 25, 125 S.Ct. at 394, 160 L.Ed.2d at 295 (shore an artificial place to draw the line). Given the primary purpose of admiralty jurisdiction, protecting maritime commerce, Foremost, supra, 457 U.S. at 674-75, 102 S.Ct. at 2658, 73 L.Ed.2d at 306, admiralty jurisdiction is proper here.
That said, we next turn to the question of which state's substantive law should be applied. Where an action sounds in admiralty, the choice of law inquiry is governed by the United States Supreme Court's decision in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). Calhoun, supra, 216 F.3d at 343, 345. The Lauritzen Court identified multiple factors for courts to consider in rendering choice of law decisions, with four of those factors relevant when, such as here, the dispute is solely domestic.[4]Id. at 345-46. The following four factors are relevant to solely domestic admiralty disputes: place of the wrongful act; allegiance or domicile of the injured party; place of contract; and the law of the forum. Ibid. In Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 309, 90 S.Ct. 1731, 1734, 26 L.Ed.2d 252, 256 (1970), the Court held that the Lauritzen factors are not exhaustive, and incorporated an eighth factor, the defendant ship owner's base of operations. According to the Calhoun court, this latter consideration is more relevant to international disputes. See supra, 216 F.3d at 346.
The Lauritzen rule is intended to balance the interests of various states, Calhoun, supra, 216 F.3d at 347; it represents "a move toward analyzing which state has the most significant relationship to the incident and the dominant interest in having its law applied." Id. at 346. The Restatement (Second) of Conflicts of Law § 145 (1971) recognizes Lauritzen as an example of the "most significant relationship" standard for analyzing conflicts of laws. Id. at 346 n. 14; Scott v. E. Air Lines, Inc., 399 F.2d 14, 28 n. 6 (3d Cir. 1968), cert. denied, 393 U.S. 979, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968).
New Jersey follows a similar analysis. Even though New Jersey applies the governmental interests test for determining choice of law questions, sections 6 and 145 of the Restatement (Second) of Conflicts of Law also guide New Jersey courts in that analysis. Fu v. Fu, 160 N.J. 108, 119, 733 A.2d 1133 (1999). New Jersey "adheres to the method of analysis" set forth in the Restatement because the "governmental-interest" and the "most-significant-relationship" tests are "substantially similar." Id. at 144 (Pollock, J., dissenting). Consequently, New Jersey law, as informed by the Restatement, guides our determination of which state's law applies to the putative class members.
*697 The Restatement provides that factors relevant to a choice of law decision in the realm of tort law include: the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; and ease in the determination and application of the law to be applied. Restatement (Second) of Conflicts of Law § 6(2) (1971) (articulating seven factors to be considered in all choice of law decisions); Restatement, supra, § 145(1) comment b (noting that in tort law, three of the factors of section 6(2) are relatively insignificant); see also Fu, supra, 160 N.J. at 122, 733 A.2d 1133 (identifying the seven factors in section 6 of the Restatement). To address an issue arising out of tort law, the Fu Court grouped the factors of Restatement section 6(2) into five categories: (1) interests of interstate comity; (2) interests of the parties; (3) interests underlying the field of tort law; (4) interests of judicial administration; and (5) competing interests of the states. Fu, supra, 160 N.J. at 122, 733 A.2d 1133 (citing Restatement, supra, § 145(1) comment b (also grouping principles of section 6(2) into five categories)).
In a consumer fraud class action, the first factor, the interests of interstate comity, "require[s] application of the law of any potential claimant's state of residence because application of any other state's law would frustrate the domiciliary state's legislative policies." Fink, supra, 365 N.J.Super. at 585, 839 A.2d 942 (citing Fu, supra, 160 N.J. at 122-23, 733 A.2d 1133). That is so because the consumer fraud statutes of the many states differ vastly in scope of recovery, burdens of proof, and standing of private plaintiffs. Ibid. Thus, to apply the law of one state would frustrate the public policies of the other states. Id. at 585-86, 839 A.2d 942.
The second category, the "interests of the parties," which focuses on expectations of the parties and predictability of result, is irrelevant in tort cases. Id. at 592, 839 A.2d 942; see also Fu, supra, 160 N.J. at 123, 733 A.2d 1133; Restatement, supra, § 145(1) comment b.
Category three, the "interests underlying the field of tort law," requires courts to consider "the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by application of a state's local law." Fu, supra, 160 N.J. at 123, 733 A.2d 1133 (citing Restatement, supra, § 145(1) comment c). If the tort rule serves a deterrent purpose, "the state where the harmful conduct took place will likely have the dominant interest with respect to that rule." Ibid. On the other hand, "when the tort rule is designed primarily to compensate a victim for his or her injuries, the state where the injury occurred, which is often where the victim resides, may have the greater interest in the matter." Ibid. Thus, it is necessary to evaluate on a case-by-case basis the relative weight of those underlying purposes with respect to each specific rule at issue. Ibid.
The fourth category, the "interests of judicial administration," requires a court to consider the relative ease of determination of the choice of law regarding a specific issue; this in turn furthers the values of uniformity and predictability. Fink, supra, 365 N.J.Super. at 593, 839 A.2d 942. The considerations under this category "are of lesser importance and must yield to a strong state interest implicated by the remaining factors." Fu, supra, 160 N.J. at 124, 733 A.2d 1133 (citing Restatement, supra, § 145(1) comment b (predictability and uniformity of result of lesser import in tort choice of law)).
*698 Of the five groups of interests identified by Fu, supra, the most significant factor in the tort field is the fifth category, "the competing interests of the states," which requires an analysis of whether application of a state's law under the circumstances of the case will advance the policies that the law was intended to promote. Id. at 125, 733 A.2d 1133. It is the qualitative nature of a state's contacts that ultimately determines whether its law should apply. Fu, supra, 160 N.J. at 125, 733 A.2d 1133.
Section 145(2) of the Restatement specifies the contacts that are most significant to an analysis of the "competing interests of the states." Ibid. They are "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement, supra, § 145(2); Fu, supra, 160 N.J. at 125, 733 A.2d 1133 (also listing these factors). These contacts are to be evaluated according to their relative importance with respect to the particular issue. Restatement, supra, § 145(2); Fu, supra, 160 N.J. at 125, 733 A.2d 1133.
Under the Restatement, in a tort action for fraud or misrepresentation, where a defendant's misrepresentations and a plaintiff's receipt of and reliance on them took place in the same state, that state's law will govern unless, based on the principles of section 6, another state has a more significant relationship to the occurrence and the parties. Restatement, supra, § 148(1). In that case, the law of the state with the more significant relationship will apply. Ibid. The place of injury is less significant in a fraud action than in a personal injury action. Restatement, supra, § 145(2) comment f.
In the context of the choice of law framework in this case, because this action sounds in admiralty, we begin with the Lauritzen analysis, which, like the Restatement, looks to which state has the most significant relationship to the incident, and the dominant interest in having its law applied. Calhoun, supra, 216 F.3d at 346 n. 14; Scott, supra, 399 F.2d at 28 n. 6.
The Fu Court organized the relevant factors of the Restatement into five categories, only two of which are significant in the realm of tort lawthe interests of interstate comity and the competing interests of the statesthe first and fifth categories, respectively, see supra, 160 N.J. at 122, 733 A.2d 1133; in the tort choice of law analysis they "assume greater importance" than the other factors. See Restatement, supra, § 145(1) comment b. These two categories both favor application of the law of the plaintiffs' states of residence. In a consumer fraud class action, like here, the interests of interstate comity "clearly require application of the law of any potential claimants' state of residence because application of any other state's law would frustrate the domiciliary state's legislative policies." Fink, supra, 365 N.J.Super. at 585, 839 A.2d 942. The competing interests of the states, the most significant consideration in tort choice of law, is analyzed by looking to the four factors articulated in section 145(2) of the Restatement. Fu, supra, 160 N.J. at 125, 733 A.2d 1133 ("the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered"). Those factors applied here counsel in favor of application of the law of each individual plaintiff's home state.
*699 Calhoun, supra, is also instructive in this analysis. Applying Lauritzen, the court focused on the place of the injury; whether the place of injury was "fortuitous"; and upon the domicile of the injured parties. See 216 F.3d at 346-47; see also Restatement, supra, § 145(2)(a), (b) (focusing on place of injury and place where conduct causing injury occurred); Restatement, supra, § 148(1) (where misrepresentations, their receipt, and reliance on them occurred in same place, law of that place should apply, absent another jurisdiction having a more significant relationship); Restatement, supra, § 145(2) comment e (where place of injury fortuitous, it does not play important role in selection of applicable law).
Thus, here, looking first to the location of the injury, we conclude that the fraudulent practices and ensuing losses occurred at auctions aboard ships on navigable waters. The ships departed from ports in various states and foreign countries. While the record is not specific as to the ships' locations at the times the auctions were conducted, the auctions occurred aboard the ships, while they were cruising or docked in United States waters, foreign territorial waters, or international waters. Defendants could have held an on-ship auction at any point during a particular cruise. That an auction may have occurred, hypothetically, while the ship was docked in Puerto Rico, as opposed to cruising in international waters or the waters of a state or foreign country, would appear to be no more than mere chance. Where the harm occurred, therefore, the site of the auction itself, was simply fortuitous.[5]See Calhoun, supra, 216 F.3d at 346-47. Put another way, here, because mere chance dictated the situs of the injuries, the injuries' connection with their place of occurrence is tenuous at best, and no particular jurisdiction has an especially strong interest in having its law applied.
We turn next to the place where the relationship is centered. Fu, supra, 160 N.J. at 125, 733 A.2d 1133; Restatement, supra, § 145(2)(d). While some putative plaintiffs undoubtedly boarded cruise ships in Florida where Park West at Sea is headquartered, it is likely that some did not, and even those who did board in Florida did not form a relationship with defendants until attending an on-board auction. The jurisdictions where the relationships between the parties were formed are the same jurisdictions where the auctions occurred; and, as discussed, none have a significant interest in having their law applied. Thus, the locations where the injuries or the conduct causing the injuries occurred, and where the parties' relationships are centered demonstrate only tenuous connections to this lawsuit.
That takes us to a consideration of the remaining factor of Restatement section 145(2) mentioned in Fu, "the domicile, residence, nationality, place of incorporation and place of business of the parties." Supra, 160 N.J. at 125, 733 A.2d 1133. This factor is the most compelling under the circumstances of this case. We conclude that it is the home states of the individual plaintiffs that have "a more significant relationship with the occurrence and the parties as to the particular issue involved." Scott, supra, 399 F.2d at 28. A significant factor in this lawsuit is compensation of *700 the victims. The plaintiffs' home states have a "substantial interest in obtaining compensation for [their] citizens in order to remedy wrongs that have been committed against" them. Calhoun, supra, 216 F.3d at 347; cf. Int'l Union, supra, 384 N.J.Super. at 298, 894 A.2d 1136 ("All consumer fraud laws . . . are designed to protect consumers to some degree.").
When the interest affected in a tort action is a personal one, domicile is of greater importance than when the interest is a business or financial one. Restatement, supra, § 145 comment e. Plaintiffs here allege a purely economic injury, but in a personal, not a business, capacity. If a plaintiff is a natural person, where the loss is pecuniary in nature, the plaintiff's place of residence is a contact of substantial significance. Restatement, supra, § 148(2) comment i. This is so because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship. Ibid. The place of business or residence of the plaintiff is more important than are similar contacts on the part of the defendant. Ibid. Therefore, in a consumer fraud class action, a putative class member's residence is a contact greater in significance than a defendant's principle place of business. Fink, supra, 365 N.J.Super. at 592, 839 A.2d 942. Accordingly, applying admiralty principles as informed by the Restatement and New Jersey decisional law, it is the place of residence of each individual plaintiff that will dictate which state's law applies in each individual case.
Alternatively, if, exclusive of the application of admiralty principles, we apply New Jersey's choice of law principles because New Jersey is the forum state, we arrive at the same conclusion; we apply the law of the domicile of each respective class member. In deciding choice of law issues, New Jersey applies the "governmental-interest" test, which seeks to apply the law of the state with the greatest interest in governing the specific issues in the underlying litigation, Fu, supra, 160 N.J. at 118, 733 A.2d 1133, and which is "substantially similar to the [Restatement's] most-significant-relationship test." Id. at 144, 733 A.2d 1133 (Pollock, J., dissenting); see also Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621, 917 A.2d 767 (2007) (when suit filed in New Jersey, we "subscribe to the . . . governmental-interests analysis").
The first prong of the test requires a determination, on an issue-by-issue basis, that an actual conflict exists between the laws the parties seek to apply. Fu, supra, 160 N.J. at 118, 733 A.2d 1133. If a conflict exists, the second prong requires the court to determine which state has the most significant relationship to the occurrence and the parties with respect to the issue to be decided. Id. at 119, 733 A.2d 1133; see also Rowe, supra, 189 N.J. at 621-22, 917 A.2d 767. The factors set forth in sections 6 and 145 of the Restatement guide this evaluation. Fu, supra, 160 N.J. at 119, 733 A.2d 1133.
Here, in analyzing the first prong of New Jersey's choice of law framework, we conclude that numerous actual conflicts exist between provisions of the New Jersey Consumer Fraud Act and the consumer protection statutes of other states. Fink, supra, 365 N.J.Super. at 570-84, 839 A.2d 942 (conducting detailed analysis of differences between New Jersey's consumer fraud statute and those of other states); see also In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018 (7th Cir.2002) ("[s]tate consumer protection laws vary considerably"), cert. denied, 537 U.S. 1105, 123 S.Ct. 870, 154 L.Ed.2d 774 (2003); Int'l Union, supra, 384 N.J.Super. at 293-94, 894 A.2d 1136 (same). The differences between the consumer fraud statutes of *701 the various states are significant. New Jersey allows private class actions for consumer fraud while several other states do not; some states require proof of scienter, New Jersey does not; variations exist in the area of damages, especially the decision or ability of a court to award punitive or treble damages. Int'l Union, supra, 384 N.J.Super. at 294, 894 A.2d 1136.
Consequently, because an actual conflict exists among the various state consumer protection statutes, we look to the second prong of New Jersey's conflict of laws analysis, which applies the principles articulated in the Restatement; this analysis is substantially the same as the choice of law analysis applied under admiralty law. See Calhoun, supra, 216 F.3d at 346 n. 14; Fu, supra, 160 N.J. at 119, 733 A.2d 1133. Each is guided by the Restatement and requires that each punitive class member's claim be governed by the law of his or her state of residence.
The question remains though, whether, under this analysis, the application of the laws of what may be all fifty states defeats predominance. While the existence of state law variations does not ipso facto defeat certification of a multi-state class, the onus is on the plaintiff to provide an extensive analysis of the state law variations so that the court can determine whether insurmountable obstacles to certification exist. Fink, supra, 365 N.J.Super. at 569, 594, 839 A.2d 942. That is because "[i]f more than a few of the laws of the fifty states differ, the [trial] judge [may] face an impossible task [in] instructing a jury on the relevant law . . . [this would provide a] reason why class certification would not be the appropriate course of action." In re Am. Med. Sys., Inc., 75 F.3d 1069, 1085 (6th Cir.1996).
Where the plaintiffs do not illustrate how the variations among potentially applicable state laws can be fairly and efficiently adjudicated, class certification is improper. In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 350 (D.N.J.1997). In In re Ford, the defendants detailed the variations among the states' laws on the various issues and causes of action listed for trial. Id. at 350-51. The court agreed with the defendants that class certification had not been established, concluding:
Viewing these variations in the context of a case involving five state-law causes of action, the laws of fifty states, and over twenty-three million plaintiffs . . . this suit cannot be practically and efficiently tried as a class action because plaintiffs have not established a predominance of common legal issues.
[Id. at 351.]
Here, plaintiffs did not submit a plan for the adjudication, at trial, of claims based on the laws of potentially all fifty states. Though there is only one cause of action, consumer fraud, and the plaintiffs are not so numerous as they were in In re Ford, class certification is not warranted for the same reasons it was not warranted in that case. The consumer fraud statutes of the fifty states vary greatly from one another, and, as noted, the differences are significant; indeed, some states do not allow private causes of action under their statutes. Fink, supra, 365 N.J.Super. at 570-84, 839 A.2d 942. Plaintiffs estimate that 90,000 individuals bid on art on Carnival Cruise Lines alone, and defendants note that they conducted auctions on six additional cruise lines. A class of plaintiffs comprised of these passengers would likely involve residents of all fifty states. Given the numerous differences among the various state consumer protection laws and the absence of a plan for their presentation at trial, in light of the expansiveness of the class, the manageability obstacles cannot *702 be overcome and predominance of common issues of law has not been established.

V.
In sum, we conclude that the difficulties likely to be encountered in the management of a class action as a result of the application of the governing law of each state of residence of the putative plaintiffs precludes certification of the class, and consequently, the trial court's order certifying the class represents an abuse of discretion.
Reversed and remanded.
NOTES
[1] Defendant Carnival Cruise Lines was dismissed on summary judgment.
[2] While the court's order certifying the class did not confine the class solely to residents of the United States, the parties concede that this was a clerical error.
[3] The parties agree that the reference in the order to the New Jersey Consumer Fraud Act was an error; the court's oral and written decisions certify the class pursuant to Florida's consumer fraud statute.
[4] The dispute here is solely domestic because all members of the class are United States residents and defendants are both incorporated and maintain their principal places of business in the United States.
[5] As noted, plaintiffs claim the conduct causing the injury occurred on land, in the corporate offices of defendants where they formed their fraudulent scheme. We disagree. The conduct causing the injury was the auctions, which occurred aboard ship, in navigable waters. Nevertheless, to the extent that the scheme originated on land, it would still be sufficiently connected to maritime activity as to implicate maritime jurisdiction. See our discussion at pp. 116-18, 925 A.2d 695-96, supra.